1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    HOUSTON DIVISION

4
UNITED STATES OF AMERICA
5
                                      December 5, 2012
6  V.                                 Houston, Texas
                                      10:19 a.m.
7
ASHLEY NICOLE RICHARDS,              4:12-cr-00731-1
8  BRENT JUSTICE                     4:12-cr-00731-2
9        Defendants

10

11              ARRAIGNMENT/DETENTION HEARING

12        BEFORE THE HONORABLE GEORGE C. HANKS JR.

13              UNITED STATES MAGISTRATE JUDGE

14 APPEARANCES:

15
For the United States            Sherri Lynn Zack
16                                 Bob Stabe, AUSA
                                   U. S. Attorney's Office
17                                 1000 Louisiana
                                   Suite 2300
18                                 Houston, Texas 77002

19 For Defendant Richards          Joyce Raynor, AFPD
                                   Office of the Federal Public
20                                     Defender
                                   440 Louisiana
21                                 Suite 1350
                                   Houston, Texas 77002-1634
22

23

24

25 Proceedings from the official electronic sound recording;
   transcript produced by court approved transcriber.

DIGITAL SCROLL TRANSCRIPTION                    281.996.7978

1   For Defendant Justice                Philip G. Gallagher, AFPD
                                         Office of the Federal Public
2                                            Defender
                                         440 Louisiana
3                                        Suite 1350
                                         Houston, Texas 77002-1634
4
5   Courtroom Deputy                     Jeanette Gonzalez

6   Electronic Recording Operator        Alisha Maly-Watson
                                         U. S. District Clerk's
7                                            Office
                                         515 Rusk
8                                        Houston, Texas 77002

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

                              INDEX

2

                                                    Page

3  <u>WITNESS FOR THE GOVERNMENT</u>:

4      Officer Susanne Hollifield

5
           Direct Examination by Ms. Zack            10
6          Voir Dire Examination by Mr. Gallagher     30
           Direct Examination Continuing by Ms. Zack  30
7          Cross Examination by Mr. Gallagher         54
           Cross Examination by Ms. Raynor            69

8
       Officer Susanne Hollifield (Recalled)

9
           Direct Examination by Ms. Zack           100
10         Cross Examination by Mr. Gallagher       101
           Redirect Examination by Ms. Zack         103
11         Recross Examination by Mr. Gallagher     103

12 <u>EXHIBITS</u>:                        <u>Offered</u>   <u>Admitted</u>

13
    G-1          Puppy 1/2 Video(s)                  22
14  G-2          Whitechick 1/2/3 Video(s)           27
    G-3 and G-4  Black Love Sample Video(s)          32
15  G-5 and G-6  Adam Meets Eve Video(s)             35

16 <u>ARGUMENT</u>:

17
    By Ms. Zack           85/99
    By Mr. Gallagher      90
18  By Ms. Raynor         96

19
    COURT RULING          106

20

21

22

23

24

25

1          THE COURT:  The next two cases the Court will call

2    together, Cause Numbers 12-cr-731-1 and 731-2, the United

3    States of America versus Ms. Ashley Nicole Richards and Mr.

4    Brent Justice.

5          MS. ZACK:  Sherri Zack on behalf of the State, Your

6    Honor -- oh, the United States.

7       (Side bar remark off the record.)

8                I'm sorry.

9          MR. GALLAGHER:  And Phil Gallagher for Mr. Justice.

10         THE COURT:  Okay.

11         MS. RAYNOR:  Attorney Joyce Raynor for Ms. Richards.

12         THE COURT:  Okay.

13               Good morning, everyone.

14         MS. RAYNOR:  Good morning.

15         THE COURT:  Good morning Mr. Justice and --

16         DEFENDANT JUSTICE:  Good morning, Your Honor.

17         THE COURT:  -- Ms. Richards.

18         DEFENDANT RICHARDS:  Good morning.

19         DEFENDANT JUSTICE:  Good morning.

20         THE COURT:  We're here this morning for two purposes:

21   first, for your arraignment and then, second, for your

22   detention hearing.

23               For the arraignment, the Court is going to

24   formally accept your plea of either guilty or not guilty to

25   the charges that have been brought against you in this matter.

1          Before I can do that, I need to make sure that
2   both of you understand what the charges are that have been
3   brought against you, as well as the potential penalties that
4   could be assessed against you should you be found guilty of
5   these charges.

6          I need to ask each of you before we begin, Ms.
7   Richards, have you had a chance to visit with Ms. Raynor
8   regarding the charges against you and the penalties, and do
9   you understand those charges?

10          DEFENDANT RICHARDS:  Yes.

11          THE COURT:  Okay.

12          And, Mr. Justice, the same thing, have you first
13  had a chance to visit with Mr. Gallagher regarding the
14  charges, and also, do you understand the charges brought
15  against you?

16          DEFENDANT JUSTICE:  Yes, sir.

17          THE COURT:  Okay.

18          In the criminal Indictment that's been filed
19  against you you've been charged in Counts 1 through 7.  In
20  Counts 1 and 2, you've been charged with the creation of
21  animal crush videos, in violation of 18 USC section 48(b)(1)
22  (A) and 2, and in Count 3 you've been charged with the
23  creation of animal crush videos in violation of 18 USC section
24  48(b)(1)(B) and 2.  Count 4, you've been charged with the
25  creation of animal crush videos in violation of 18 USC section

1  48(b)(1)(A), (b)(1)(B) and 2.  In Count 5, you've been charged

2  with distribution of animal crush videos in violation of 18

3  USC section 48(b)(2) and 2.  In Count 6, you've been charged

4  with engaging in the business of selling or transferring

5  obscene matter in violation of 18 USC section 1466(a) and 2,

6  and finally, in Count 7, you've been charged with production

7  and transportation of obscene matters for sale or distribution

8  in violation of 18 USC section 1465 and 2.

9             The potential penalties for these offenses

10 should you be found guilty of Counts 1 through 5, up to seven

11 years imprisonment and/or a two hundred and fifty thousand

12 dollar fine, supervised release for any term of years not to

13 exceed three years and a one hundred dollar special

14 assessment.

15            On Counts 6 and 7, you could be assessed up to

16 five years imprisonment and/or a two hundred and fifty

17 thousand dollar fine, supervised release for any term of years

18 not to exceed three years and a one hundred dollar special

19 assessment.

20            At this time, Mr. Richards -- I mean, Ms.

21 Richards, are you ready to enter a plea in this matter?

22      DEFENDANT RICHARDS:  Yes.

23      THE COURT:  And at this time, Mr. Justice, are you

24 ready to enter a plea in this matter?

25      DEFENDANT JUSTICE:  Yes, sir.

1        THE COURT:  Okay.

2            Mr. Gallagher, do you wish to waive the formal

3  reading of the Indictment for your client?

4        MR. GALLAGHER:  Yes, Your Honor.

5        THE COURT:  And, Ms. Raynor, do you wish to waive the

6  formal reading of the Indictment for your client?

7        MS. RAYNOR:  Yes, Your Honor.  I would.

8        THE COURT:  Okay.

9            Ms. Richards, with respect to the charges

10  brought against you in the Indictment, how do you plead?

11  Guilty or not guilty?

12        DEFENDANT RICHARDS:  Not guilty.

13        THE COURT:  Okay.

14            The Court accepts your plea and a not guilty

15  plea will be entered into the Court's record on your behalf.

16            Mr. Justice, with respect to the charges brought

17  against you in the criminal Indictment, how do you plead?

18  Guilty or not guilty?

19        DEFENDANT JUSTICE:  Not guilty, Your Honor.

20        THE COURT:  Okay.

21            The Court accepts your plea and a not guilty

22  plea will be entered into the Court's record on your behalf as

23  well.

24            This case, Mr. Richards -- Ms. Richards and Mr.

25  Justice will be tried before Judge Sim Lake.  Judge Lake has

1   asked that I enter what's known as scheduling order in this

2   case, and that is basically an order setting forth the

3   deadlines for getting this case ready for trial.

4            What I'm going to do at this time is go through

5   those dates with you to make sure that everybody's on the same

6   page, and once I'm done, you'll get a copy of these -- these

7   dates.

8            Ms. Zack and Mr. Gallagher, I know you've

9   practiced before Judge Lake before.  He has very specific

10  local rules with respect to the trial of his criminal matters.

11  Just be aware of those when you're getting ready for trial.

12           MS. RAYNOR:  Yes, Your Honor.

13           THE COURT:  All motions in this matter will be filed

14  no later than December 19th, 2012.  All responses to motions

15  will be filed by December 27th, 2012, and this case is going to

16  be set for trial on January 14th, 2013, at one o'clock p.m.

17           So, Ms. Richards, Mr. Justice, those are --

18  that's going to be your trial date in this case.

19           Estimated time of trial?

20           MS. ZACK:  Three to four days, Your Honor.

21           MR. GALLAGHER:  I agree.

22           THE COURT:  Okay.

23           Ms. Raynor?

24           MS. RAYNOR:  Agree.

25        (Pause in the proceedings.)

1          THE COURT:  Okay.

2               I've gone ahead and entered the scheduling

3    order, so that concludes the arraignment.

4               Now, what we're going to do is conduct your

5    detention hearing in this matter.

6               As I mentioned when you were before me last

7    time, the Government has moved that both of you be detained in

8    this case pending trial, because you're either a risk of

9    flight or a danger to the community the Government believes,

10   and you should not be released from custody pending the trial

11   in this matter.

12              Because the Government so moved, you have a

13   right to this detention hearing.  What we're going to do at

14   this time is the Court's going to hear evidence from the

15   Government as to why you should be detained and your counsel

16   is going to present evidence to the Court as to why you should

17   not be detained.  And the Court will make a decision at the

18   conclusion of that evidence.

19              DEFENDANT JUSTICE:  Yes, sir.

20              THE COURT:  So, if you wouldn't mind just having a

21   seat at the counsel table, and Ms. Zack whenever you're ready

22   you may call your first witness.

23              MS. ZACK:  Thank you, Your Honor.

24              At this time, the United States will call

25   Officer Susanne Hollifield.

 1              THE COURT:  Okay.

 2                   Good morning, Officer.

 3              MS. HOLLIFIELD:  Good morning.

 4              THE COURT:  If you could just step forward and be

 5  sworn?

 6       (Witness sworn.)

 7              COURTROOM DEPUTY:  Thank you.

 8                   Please have a seat.

 9              THE COURT:  Okay.

10                   You may proceed when ready.

11              MS. ZACK:  Thank you, Your Honor.

12       OFFICER SUSANNE HOLLIFIELD, GOVERNMENT'S WITNESS, SWORN

13                        DIRECT EXAMINATION

14  BY MS. ZACK:

15  Q  Officer, could you tell us how your employed?

16  A  I'm a Houston Police Officer.

17  Q  And how long have you been a Houston Police Officer?

18  A  Almost eighteen years.

19  Q  And are you currently assigned to any particular unit or

20  task force?

21  A  I'm assigned to the Major Offender's Division, and within

22  that division I'm assigned to the Animal Cruelty Squad.

23  Q  And how long have you been investigating animal cruelty?

24  A  For over two years.

25  Q  And do you have special training that you've undergone in

1  order to investigate these types of cases?

2  A  I do.  I hold a certification from the University of

3  Missouri to investigate crimes of animal cruelty.

4  Q  And directing your attention to this particular case, can

5  you explain to the Court how the Houston Police Department

6  became aware of these crimes?

7  A  On August the 14th, 2012, I got a call from Chris Fontes

8  (phonetics).  He's a case worker for PETA, which is the People

9  for the Ethical Treatment of Animals.

10             He informed me that he possessed videos that

11  depicted an African American female torturing and killing

12  animals.

13             PETA believed that the suspects -- or the

14  suspect lived in Houston, Texas, based on some evidence that

15  they saw in the videos.

16             Mr. Fontes gave me access to the videos, and I

17  watched the videos.  And he also gave me some other

18  information that provided some information about the suspect.

19             That same day I did some checks in some

20  databases that are available to law enforcement, and by August

21  the 15th we had -- where -- I was able to identify Ashley

22  Richards as being the person in the videos that were supplied

23  by PETA.

24  Q  Okay.  Were you able to identify anyone else that was part

25  of the production of those videos?

1   A   Eventually, I was able to identify Brent Justice.  He was

2   in one of the videos.  In the video, you only see an arm and a

3   leg, but during the investigation and after he was interviewed

4   he told us that he was the camera person in one of the videos.

5   Q   And do you have reason to believe that he participated in

6   more than one of the videos?

7   A   I do.

8   Q   And why is that?

9   A   I've watched over forty-five videos that were provided to

10  me about the crushing videos.  In many of those videos you

11  hear a male's voice, either giving instructions or affirming

12  what she is doing, and I believe that that voice is Brent

13  Justice's based on -- I've had conversations with him, and

14  I've listened to an interview that was done by the Houston

15  Police Department.  I believe it's the same voice.

16  Q   And did you have an opportunity to speak with Ashley

17  Richards?

18  A   Yes.  I did.

19  Q   And what did she indicate was Brent Justice's level of

20  participation?

21  A   Ashley said -- Ms. Justice -- I'm sorry.  Ms. Richards said

22  that Brent Justice was not involved in the making of the crush

23  videos and that he was not the cameraman in the videos.

24  Q   And do you find that hard to believe given your

25  investigation and what you found, not only physically about

1  where they lived but on computers and in other evidence you've

2  been able to develop?

3  A   Yes.  I do not believe her statement.

4  Q   Okay.

5                    And what have you found that further leads you

6  to believe that Mr. Justice is involved in the sale,

7  distribution, and production of these videos?

8  A   When he was interviewed by the Houston Police Department,

9  during the interview the officer who conducted the interview

10  noticed a mark, either a birthmark or some type of mark on Mr.

11  Justice's right arm.

12                    If you look at the Puppy 2 video, which is a

13  crushing video case, you can see that same mark on the arm.

14                    And then we've also -- when I executed a search

15  warrant at -- at 139- -- 13919 Walker Lane, which is where

16  they lived, I was able to get some information off of the

17  computers.  And we got some information from their email

18  accounts that indicated Mr. Justice was involved in the

19  distribution -- in the creation of the videos.

20  Q   Can you explain to the Court how these videos -- how would

21  someone find this video?  How do you get them?

22  A   You can go online and -- it is a sexual fetish.  So, if you

23  go online, you can Google -- use a search engine like Google

24  and search for crush videos, and you will get a return with a

25  video that's by Ms. Richards where she's labeled Tilapia Kill,

1   and she gives you -- she tells you a little bit about the

2   videos.

3                    There are other websites that will also return

4   where crush videos are available for sale.

5   Q   Now are all crush videos illegal?

6   A   No.

7   Q   Okay.  So, can you explain to the Court the difference

8   between the ones that are legal and the ones that are illegal?

9   A   The videos that are -- that are legal are commonly referred

10  to as soft crush videos.

11  Q   Okay.

12  A   Those videos are when smaller animals, like mice, crawfish,

13  roaches, are stepped on and killed.  Hard crush videos are

14  commonly referred -- are for bigger -- larger animals, like

15  dogs, cats, rabbits, things of -- of a larger animal.

16  Q   And on these websites you can obtain the soft crush videos;

17  is that correct?

18  A   Yes.

19  Q   Okay.  And were soft crush videos made by Ms. Richards

20  available on some of these websites?

21  A   Yes.

22  Q   And how would one get a hard crush video made by Ms.

23  Richards and Mr. Justice?

24  A   On the website that Ms. -- that Ms. Richards had there is a

25  banner on the webpage that -- that -- that advertises for you

1  to contact her on an email address known as

2  cruelmeshallet2010@yahoo.com.

3              So, you can get her personal email address off

4  that webpage and send her an email and request -- and request

5  hard crush videos.

6  Q  Okay.  And do you know whether or not that was ever done?

7  A  Yes.

8  Q  Okay.  And is that based on information from search

9  warrants and investigation that you've conducted in

10  conjunction with the FBI?

11  A  Yes.

12  Q  Okay.  Now, how would a purchaser, if they bought a video

13  from her, how would they get it?

14  A  The purchaser would first have her -- first have their

15  communications with -- with Ms. Richards.  They would discuss

16  what type of video that the customer wanted.  They would

17  dictate what type of animal.  Then, that customer would send

18  Ms. Richards money -- we found either by PayPal or Western

19  Union.  And once the money was transferred, Ms. Richards would

20  send the link of a video through a website called Send Space

21  is one example, and she would send the link to the customer,

22  and the customer was able to click on the link to obtain the

23  crush video.

24  Q  And was there any link from Send Space that indicates the

25  Mr. Justice was involved?

 1  A   Yes.  On the Send Space emails, a name of Terrance Johnston

 2  is copied on the emails.  Through our investigation we have

 3  determined that Terrance Johnston is really Brent Justice.

 4  Q   And how do you know that?

 5  A   We served a search warrant on a yahoo mail account,

 6  terrancejohnston40@yahoo.com.  The results showed us many,

 7  many emails that showed pictures of Brent Justice.  There was

 8  actually an email in there where Brent Justice purchased

 9  minutes to -- so that he could conduct phone calls in Ghana.

10              There are numerous pictures of him.  There's

11  also videos of him showing his penis to -- it's a -- it's a

12  file where he -- there's a video of him showing his penis that

13  he sent to a woman in Ghana.  So, it's clear -- it was clear

14  to us that it was Terrance Johnston was truly Brent Justice.

15  Q   And from your investigation, are you aware of whether or

16  not Mr. Justice and Ms. Richards have used aliases in the

17  past?

18  A   Yes.

19  Q   And let's talk about the videos.

20  A   Okay.

21  Q   You indicated that you viewed these videos.

22  A   Yes.

23  Q   Would you characterize them as violent in nature?

24  A   Yes.

25  Q   Now, let's talk specifically about the videos that were

 1  charged in the Indictment.

 2              When you watched these videos, could you tell

 3  the Court approximately how long are the videos?

 4  A  Most of the videos are twelve to fifteen minutes, except

 5  for the samples that are -- that are a smaller version of a

 6  longer crush video.

 7  Q  Okay.  And in -- when you watched these videos, did you

 8  prepare summaries of them that summarized the -- the  video

 9  down to let's say a paragraph?

10  A  Yes.

11  Q  Okay.  I'm going to show you what's been previously shown

12  to defense counsel and what's been marked as Government

13  Exhibit 1 and ask if you recognize those still photographs?

14  A  Yes.

15  Q  And how do you recognize those?

16  A  Those still photos are from the *Puppy* 1 and *Puppy* 2 video.

17  Q  Okay.  And there is a masked person in this photograph; is

18  that correct?

19  A  Yes.

20  Q  Who do you believe that to be?

21  A  Ashley Richards.

22  Q  Okay.  And where do you believe that this video was

23  produced?

24  A  17435 Imperial Valley, Apartment 2112.

25  Q  And have you been able to verify that there was a point in

1  time where Ms. Richards resided at that location?

2  A  Yes.

3  Q  Okay.  Can you describe for the Court what is seen in the

4  videos, *Puppy* 1 and *Puppy* 2, based on your having viewed them?

5  A  Yes.  I -- I did write a summary, and I'm going to just

6  read summary from the *Puppy* 1 video.

7          "Ashley Richards fed a gray dog from her hand in the

8          kitchen.  She also gave the dog water from a

9          container.  Richards put her hand on the dog's neck

10         and raised the dog's front paws into the air.

11         Richards showed a meat cleaver to the camera.

12         Richards asked the dog if it was scared.  During the

13         video, Richards touched her burning cigarette on the

14         dog's skin several times.  Each time the dog jerked

15         and moved.  Richards bound the dog's mouth with tape

16         and bound the dog's paws with rope.  The dog tried to

17         remove the tape from its mouth.  Richards put on a

18         pair of high heels, and she stepped on the dog's

19         front right paw and the dog cried and moved."

20         That was *Puppy* 1.

21         *Puppy* 2 is a continuation of *Puppy* 1.

22         "In *Puppy* 2 the video was a continuation of the video

23         named *Puppy* 1.  Ashley Richard's heel was on the

24         dog's back right paw when the video started.  The dog

25         struggled to escape.  Richards pushed the dog to the

1    floor.  She used a meat cleaver she obtained from the

2    kitchen counter and chopped the dog's back leg.

3    Richards restrained the dog by putting her right

4    front foot on the dog's neck.  Smoke was observed in

5    front of the camera lens in the video.  Richards told

6    the dog, 'I like the way you bleed.'  The dog cried.

7    While Richards held the dog's body to the floor with

8    her left knee, Richards chopped the top of the dog's

9    neck with a meat cleaver.  A leg wearing tan pants

10   appeared on the left side of the screen.  The

11   individual wearing the tan pants placed a black knife

12   on the left -- on the kitchen floor that was within

13   Richard's grasp.  While restraining the dog, Richards

14   grabbed the black knife and used the knife to saw off

15   the underside of the dog's neck.  The dog bled and

16   struggled.  Richards severed the dog's head from its

17   body and then held the head in the air.  Richards

18   continued to saw the dog's body with the knife.

19   Richards pulled the dog's guts and organs out of the

20   dog's body.  Richards stomped on the severed dog's

21   head.  She urinated on the dead dog in the video."

22   Q  Now you indicated in that video that smoke appears in the

23   video.  Where do you think that smoke is coming from, and what

24   do you believe the source to be?

25   A  I believe it's right in front of the camera, so it could be

1  someone standing behind the camera lens.

2  Q  And what kind of smoke is it?

3  A  It looked like cigarette smoke.

4  Q  Okay.  And you indicated that Ms. Richards was smoking --

5  or had a cigarette in the video.  Does it appear that the

6  smoke is coming from that cigarette?

7  A  No.

8  Q  And are you aware of whether or not Brent Justice smokes?

9  A  Yes.  He does.

10         MS. ZACK:  Your Honor, at this time the Government

11  would offer the still photographs labeled Government Exhibit

12  1, on *Puppy* 1 and *Puppy* 2.

13         THE COURT:  Any objection?

14         MR. GALLAGHER:  No, Your Honor.

15         MS. RAYNOR:  Yes.  I do object, Your Honor.

16         She has not laid the proper foundation to have

17  those admitted into evidence.  There is no indication as to

18  how she identified that to be Ms. Richards in the photographs.

19  There's no prior knowledge of what Ms. Richards looks like and

20  the person is masked.

21         THE COURT:  Okay.

22            Response?

23         MS. ZACK:  Your Honor, I can go through all of that,

24  if you'd like me to.

25         THE COURT:  No.  I --

1      MS. ZACK:  Ms. Richards has admitted, Your Honor, to

2  being the individual in these videos in conversations with the

3  Officer, and I can ask if she's compared her knowledge of Ms.

4  Richards to photographs to the fact -- I did establish that

5  she lived at that apartment --

6      THE COURT:  Right.

7          That's probably enough, but I -- let me get -- I

8  like the follow up --

9      MS. ZACK:  Sure.

10  BY MS. ZACK:

11  Q  Why do you believe --

12      THE COURT:  -- information.

13  BY MS. ZACK:

14  Q  -- Officer, that this is Ms. Richards being that the

15  individual is masked?

16  A  During my conversations with Ms. Richards, she admitted

17  that she was the individual in the video.

18  Q  And does the individual in this video that she admitted to

19  being appear to be the same person in all of the videos that

20  you witnessed that appeared under the cruelmeshallet or

21  meshalletmoniker?

22  A  Yes.

23  Q  Has Ashley Richards ever used the name Meshallet to your

24  knowledge and given that name to law enforcement?

25  A  Yes.

1  Q  And how do you know that?

2  A  There's a Houston Police Department offense report where

3  Ms. Richards is listed as a witness and Brent Justice was

4  listed as the complainant, and when she gave her name to the

5  Houston Police Department, she actually said her name was

6  Meshallet Richards.

7  Q  And did she admit to you to using those monikers?

8  A  Yes.

9          MS. ZACK:  Your Honor, at this time, the Government

10  would move that Government's Exhibit 1 be admitted.

11          THE COURT:  Okay.

12              Response?

13          MS. RAYMOR:  Just the same objection that I have

14  before you.

15          THE COURT:  Okay.

16              Objection overruled.

17              Those exhibits are admitted.

18      (Government's Exhibit No. 1 is admitted into evidence.)

19  BY MS. ZACK:

20  Q  Let's talk about the videos entitled *Whitechick* 1, 2 and 3.

21              Are you familiar with those videos?

22  A  Yes.

23  Q  I'm going to show you what's been previously shown to

24  defense counsel and what has been marked as Government's

25  Exhibit 2.

1          Do you recognize those still photographs?

2   A  Yes.

3   Q  And what do those photographs come from?

4   A  A Dell desktop computer.  That --

5   Q  Okay.

6   A  I'm sorry -- that was seized from Ms. Richards and Mr.

7   Justice's home.

8   Q  Okay.  And the videos that these stills came from, what did

9   they depict?

10  A  Ms. Richards -- Ms. Richards torturing and killing a

11  rooster.

12  Q  Okay.  And is Ms. Richards masked in this -- in these

13  videos?

14  A  No.

15  Q  And in viewing the videos, could you summarize for the

16  Court what happens in *Whitechick* 1, 2 and 3?

17  A  In *Whitechick* 1, Ashley looks at the -- the rooster and she

18  asks, "Is she dead?"  And she tells the rooster, "No.  You're

19  not.  I have to have you."

20          Richards also said, "You don't want to be

21  crushed.  You want to be whole.  Okay.  You're already going

22  to lose your feet.  You might even lose your wings, but you're

23  going to lose your life.  So, you just don't want to lose it

24  just yet."

25          Richards squeezed the rooster's neck and the

1  rooster struggled.  Richards slapped the rooster's face

2  several times.  Richards bent the rooster's legs until a

3  cracking sound was heard.  The rooster leg -- the rooster's

4  leg was limp, and the rooster was bleeding.

5              Richard's cut the rooster's leg with a knife --

6  and I heard a male voice in this video -- in *Whitechick* 1.

7              In *Whitechick* 2, it's a continuation of

8  *Whitechick* 1.

9              She squeezed the rooster's neck and said, "Look

10 at my cameraman.  Look at my cameraman."

11             The roost- -- the rooster's eyes opened and

12 closed while Richard's squeezed the neck.  Richards asked the

13 rooster if he was scared.  She pulled some the rooster's

14 feathers out.  And I also heard a male voice and a -- in this

15 video, and I saw a finger that appeared in front of the camera

16 lens in *Whitechick* 2.

17             In *Whitechick* 3, which is a continuation of the

18 previous two, the video started and Ashley said, "Are you

19 ready for the kill?"

20             Richards twist- -- twisted the rooster's neck

21 with her hands while the rooster struggled.  The rooster

22 screamed at 8:23 at -- at the eight minute and twenty-three

23 second mark in the video, and Richards responded the rooster

24 and said, "Shut the fuck up, bitch."

25             Richards said to the rooster, "I'm fixing to be

1  real sour to you."

2              During the video, Richards referred to herself a

3  Cruel Meshallet and the Cruel Ebony Goddess.

4              Richards cut the rooster's neck with a knife in

5  the video.  Richards allowed the rooster to bleed on her while

6  she held the rooster in the air.  Richards slowly cut the

7  rooster's neck with a knife.  She pulled the rooster's head

8  from its body in the video.

9              And also in this video I can hear a male voice.

10             At the end of the video, on the -- at the end of

11 the video it displayed the following:  It said, "Cruel

12 Neshallet, white rooster killed by Cruel Meshallet.  Order

13 your own custom video today."

14 Q  And the male voice that you heard, do you believe that to

15 be Brent Justice?

16 A  I do.

17 Q  And in this video while she's not masked, would you -- how

18 would you characterize her manner of dress?

19 A  I think that most people would consider it sexy.  You can

20 definitely see some of her cleavage.

21 Q  And is there in both the videos series we talked about,

22 *Puppy* 1 and 2 and *Whitechick* 1, 2, and 3, a sexual component

23 to the video itself?

24 A  Yes.

25 Q  Your Honor, at this time, the Government would move to

 1  admit Exhibit Number 2.

 2          THE COURT:  Okay.

 3              Any objections to Exhibit Number 2 for purposes

 4  of this hearing?

 5          MR. GALLAGHER:  Not for Mr. Justice, Your Honor.

 6          MS. RAYMOR:  I need to take a look at it, actually.

 7          THE COURT:  Sure.

 8          MS. RAYNOR:  May I proceed?

 9          THE COURT:  Oh, yes, ma'am.

10      (Pause in the proceedings.)

11          MS. RAYNOR:  Your Honor, I'll object to those

12  exhibits.  Also, facially, there's not -- they're not showing

13  the face of the individual in the actual stills of the

14  pictures.  You cannot see a frontal face of the individual,

15  and there are two other pictures that you can't see the face

16  at all.

17          THE COURT:  Okay.

18          MS. RAYNOR:  So, I'm going to object to that being

19  offered into evidence based on it being Ms. Richards in the

20  photographs.

21          THE COURT:  Okay.

22              My understanding was is that you -- Officer, you

23  viewed the entire videos, and you saw that it was Ms. Richards

24  in the videos --

25          THE WITNESS:  Yes, sir.

1          THE COURT:  -- because she's not masked?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Okay.

4              Anything further?

5          MS. ZACK:  No, Your Honor.

6          THE COURT:  Okay.

7              Objection's overruled.

8              Exhibit Number 2 will be admitted.

9      (Government's Exhibit No. 2 is admitted into evidence.)

10 BY MS. ZACK:

11 Q  Now, Officer, you talked about samples.

12              What are samples?

13 A  I would describe a sample as a trailer to a movie, so to

14 speak or a teaser.

15 Q  Okay.  And did you have an opportunity to view a video,

16 entitled *Black Love Sample*?

17 A  Yes.

18 Q  And I'm going to show you what's been previously shown to

19 defense counsel as Government's Exhibits 3 and 4.

20              Do you recognize these?

21 A  Yes.

22 Q  And are these still photographs from the video, entitled

23 *Black Love Sample*?

24 A  Yes.

25 Q  And who do you believe the woman to be in *Black Love*

1  *Sample*?

2  A  Ashley Richards.

3  Q  And where do you believe *Black Love Sample* was filmed?

4  A  At 13919 Locke Lane in Houston, Texas.

5  Q  And why do you believe that?

6  A  I -- I went to the location, and the location matches the -

7  - the house is the same location as where these videos were

8  made.

9  Q  Okay.  And in the video, can you describe to the Court what

10 occurs in the video?

11 A  Yes.

12            In *Black Love Sample* Richards is seen kicking a

13 black puppy, and then the scene cuts to the puppy with its

14 front paws and mouth duct tapped.  Richards then uses a meat

15 cleaver to cut the right rear paw of the puppy.

16            In the next scene, the puppy is seen laying on

17 the floor in a pool of blood with its front paws still duct

18 taped, but its mouth unrestrained.

19            Richard uses both hands to squeeze the puppy's

20 neck while -- while it is restrained with her right knee.  On

21 the video, the puppy is heard choking and gasping for breath

22 while she strangles it.

23 Q  And in this video is she dressed in a manner that you would

24 describe as sexually provocative?

25 A  Yes.

1  Q  Is she masked?

2  A  Yes.

3  Q  Do you believe based on your viewing of all these videos

4  and your personal interaction with Ms. Richards that she is

5  the individual in these videos?

6  A  Yes.

7  Q  And in the pictures it appears -- it's a little blurry, but

8  in Government's Exhibit 3 the item in Ms. Richard's right hand

9  appears to be what?

10 A  A meat cleaver.

11 Q  And are there also in Government's Exhibit 4 evidence of

12 weapons on the hearth?

13 A  Yes.

14 Q  Okay.  And those are visible throughout the video?

15 A  Yes.

16       MS. ZACK:  Your Honor, at this time the Government

17 would offer Government's Exhibits 3 and 4.

18       THE COURT:  Okay.

19          Objections to Government's Exhibits 3 and 4?

20       MR. GALLAGHER:  May I ask just one quick question

21 just directly as to the exhibits, as if on voir dire?

22       THE COURT:  Yes, you may take the Witness on voir

23 dire.

24       MR. GALLAGHER:  Just very quickly.

25                     VOIR DIRE EXAMINATION

1  BY MR. GALLAGHER:

2  Q  With some of the previous exhibits you testified about

3  observing cigarette smoke.  QA there any of that in this --

4  close to -- coming from the camera area Was there any of that

5  in Exhibit's 3 and 4?

6  A  In *Black Love Sample,* I don't recall that it did.

7              I'm not for certain that there wasn't cigarette

8  smoke.  I'd have to go back and probably watch the video

9  again, because I don't have that indicated in my summary.

10  Q  But sitting here today you don't recall that?

11  A  No.

12  Q  Okay.

13              And was there -- is there a male voice audible

14  in the videos related to 3 and 4?

15  A  Yes, sir.

16  Q  All right.

17              And -- okay.

18         MR. GALLAGHER:  No further questions, Your Honor.

19              I don't have an objection.

20         THE COURT:  Okay.

21                 DIRECT EXAMINATION CONTINUING

22  BY MS. ZACK:

23  Q  Do you believe that that voice is Brent Justice?

24  A  Yes.

25  Q  And was this the residence where you first came in contact

 1  with Ashley Richards and Brent Justice?

 2  A  Yes.

 3  Q  And did it appear that they resided there?

 4  A  Yes.

 5  Q  And was there production equipment present to make these

 6  videos?

 7  A  Yes.

 8  Q  Can you describe the production equipment to the Court?

 9  A  There was -- there was a camera inside the house.  There

10  was a tripod.  There were computers inside the home.  There

11  were definitely clothing that Ms. Richards wore for -- in the

12  videos was -- were inside the home, as well as all the knives

13  and -- the knives that were in the videos as well.  That was

14  all inside the home.

15  Q  Thank you.

16            THE COURT:  Okay.

17                 Any objections, Exhibit 3 and 4?

18            MS. RAYNOR:  May I approach the witness, Your Honor.

19            THE COURT:  Oh, I'm sorry.

20            MS. RAYNOR:  She didn't show me that exhibit, again.

21            MS. ZACK:  Sure.

22        (Pause in the proceedings.)

23            MS. RAYNOR:  Yes, Your Honor.

24            THE COURT:  Okay.

25            MS. RAYNOR:  We object, again.  Again, there are

1  stills of photographs that -- of somebody in the video, but we

2  can't -- there's no verifiable information I believe on Ms.

3  Richards as that particular part.

4          THE COURT:  Okay.

5              My understanding is that your evidence -- your

6  testimony, Officer Hollifield, was that it was at the 13919

7  Locke Lane where these videos were taken?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  And also that in other -- I mean, in

10  viewing the videos, you saw Ms. Hol- -- I'm sorry, Ms.

11  Richard's face?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Okay.

14              Objection overruled.

15              Exhibits 3 and 4 are admitted.

16      (Government's Exhibits Nos. 3 and 4 are admitted into

17  evidence.)

18  Q  Did you have an opportunity to view entitled, *Adam Meets*

19  *Eve 1 and 2*?

20  A  Yes.

21  Q  I'm going to show you what's been marked as Government's

22  Exhibit 5 and 6.

23              Do you recognize these exhibits?

24  A  Yes.

25  Q  And where were these -- where does it appear these videos

1  were taken?

2  A  At 13919 -- 13919 Locke Lane in Houston, Texas.

3  Q  And who do you believe appears in this video?

4  A  Ashley Richards.

5  Q  Even though the individual is masked?

6  A  Yes.

7  Q  And is that based on your now personal knowledge of Ms.

8  Richards, as well as statements she made in other videos you

9  viewed?

10  A  Yes.

11  Q  Her voice?

12  A  Yes.

13  Q  And the language used in -- consistently in the videos?

14  A  Yes.

15  Q  Is -- are these -- is her dress and mode of talking once

16  again sexually provocative?

17  A  Yes.

18  Q  And can you describe to the Court what occurs in *Adam Meets*

19  *Eve 1 and 2*?

20  A  Yes.  In the first one Ms. Richards threw a black, white,

21  and gray tabby cat to the ground.  The cat's paws were covered

22  with tape.  Richards proceeded to squeeze and shake the cat's

23  neck.  The cat made noises that sounded like screams.

24          While the cat was taped to a piece of cardboard

25  on the floor, Richards whipped the cat with a rope.  Richards

 1  pushed the high -- heel of her high heel shoe into the cat's

 2  mouth.  Richards struck the cat multiple times with a meat

 3  cleaver.

 4          The cat's paw was severed in the video.

 5  Richards poured salt on the cat and struck the cat several

 6  times with the meat cleaver.

 7          A male voice is heard in this -- in this video

 8  and you can see legs of an African American in the video also.

 9  Q  Besides Ms. Richards?

10  A  Yes, besides Ms. Richards.

11  Q  Okay.

12          And what about in *Adam Meets Eve 2*?

13  A  It is a continuation of the first one.

14          Ms. Richards asks the black, white, and gray

15  tabby cat if it was enough suffering.

16          The cat was fighting to escape.  Richards

17  inserted the blade of a dagger into the cat's anus numerous

18  times.  She chopped off the cat's arm.  Richards ripped the

19  skin off the cat with her hands.  She started ripping the

20  cat's skin near the anus.  The cat's internal organs were

21  exposed.  She used a meat cleaver to chop and saw the cat's

22  neck.  She severed the cat's head from the body.

23          Richards said, "Now that's how you fuck a pussy

24  real good."

25          Richards urinated on the dead cat and then said,

1  "Kiss my ass.  Kiss it, bitch.  Kiss it."

2              She spit on the cat at the end of the video, and

3  a male voice was also heard in *Adam Meets Eve 2*.

4  Q  And do you believe that male voice to be Brent Justice?

5  A  Yes.

6              MS. ZACK:  Your Honor, at this time the United States

7  would offer Government's Exhibit 5 and 6.

8              THE COURT:  Objections?

9              MR. GALLAGHER:  Not for Mr. Justice.

10             THE COURT:  Okay.

11             Are you -- want to take a look at the --

12             MS. RAYNOR:  I do.  Thank you, Your Honor.

13             THE COURT:  Yes, ma'am.

14      (Pause in the proceedings.)

15             MS. RAYNOR:  I object again, Your Honor, to

16  Government's Exhibit 5 and 6 for the very same reason that we

17  objected to the previous exhibits.

18             THE COURT:  Okay.

19             Objection is overruled.

20             Those exhibits are admitted.

21      (Government's Exhibits Nos. 5 and 6 are admitted into

22  evidence.)

23             MS. ZACK:  Thank you, Your Honor.

24  BY MS. ZACK:

25  Q  Now, these are the videos that have been charged in the

 1  Indictment, correct, Officer?

 2  A  Yes.

 3  Q  But you indicated that you viewed up to forty-five videos

 4  that show the torture and killing of small animals by Ms.

 5  Richards?

 6  A  Yes.

 7  Q  And are they similar in their graphic nature as to what

 8  you've described here?

 9  A  Yes.

10  Q  Do they display the same calculated cruelty and sexual

11  nature?

12  A  Yes.

13  Q  I want to talk about what you've learned about the

14  individuals themselves in this case.

15              As far as the -- we've already discussed what

16  each of the individuals has admitted to, correct?

17  A  Yes.

18  Q  Let's discuss the history of Ms. Just- -- Ms. Richards.

19              Are you aware of her criminal history?

20  A  Yes.

21  Q  And can you tell the Court -- and I guess chronologically

22  is probably the easiest way for you to do that.  Is that

23  correct?

24  A  Yes.

25  Q  What her criminal history consists of that you're aware of?

 1  A   The criminal history -- she was arrested by the Waco Police

 2  Department in two thousand and -- 2010 for criminal trespass.

 3  She was convicted and she was given twelve months of

 4  probation.

 5  Q   Okay.

 6  A   And then, she had -- she was also arrested by the Waco

 7  Police Department on July 4th, 2012, of this year for

 8  assaulting a police officer and resisting arrest.

 9  Q   And is that charge still pending?

10  A   Yes.

11  Q   Was she out on bond on that charge when she was arrested in

12  this case?

13  A   Yes.

14  Q   And that -- those charges stem from an incident in Waco,

15  Texas?

16  A   Yes.

17  Q   Okay.

18              What other incidents or contact with law

19  enforcement are you aware of concerning Ms. Richards.

20  A   In September of 2009 Ashley tried to cash some checks at a

21  Credit Union in Waco, Texas.  The bank suspected that the

22  checks were fraudulent and called the police.  When the police

23  came to the scene to conduct their investigation, they

24  interviewed Ashley and she provided a story about how she

25  obtained the checks.

1          The police also interviewed Brent Justice, who

2    originally gave a false name and a false date of birth, but

3    during the process of the investigation they were able to

4    determine his true identity.

5          Neither Ms. Richards nor Mr. Justice were

6    arrested in that incident.  The Credit Union just asked Mrs.

7    Richards to pay back the money and that would -- they would be

8    -- they would be content with that settlement.

9    Q  Okay.

10          Are you aware of any incidents of domestic

11   violence between the individuals?

12   A  Did you want -- you're wanting me to skip through, or you

13   want me to go chronologically through all them.

14   Q  Oh, no.  I'm sorry.  I'm sorry.  I jumped ahead.

15          What other incidents do you have?

16          Go ahead.  I'm sorry.

17   A  The Houston Police Department has a report from August of

18   2009 where an employer claimed that some of the checks were

19   missing from the company's account.  The employer said that --

20   an ex-employee, Brent Justice, may know something about the

21   theft.  He was recently fired.

22          Ashley Richards was listed as a suspect in this

23   offense report where there was a money loss of over two

24   thousand dollars.  The Houston Police Department did not do a

25   follow up investigation with the case, so it ended at that

 1  point.

 2              In October of 2009, that was the incident where

 3  Ashley Richards was listed as a witness in a case, and Brent

 4  Justice was listed as a complainant.  He was approached by a

 5  bounty hunter, and Mr. Justice ended up calling the police.

 6  But this is the incident where she gave a false name to the

 7  Houston Police Department and said her name was Meshallet

 8  Richards.

 9              And then, we have the incident in February of

10  2010, where she was arrested and convicted for the criminal

11  trespass in Waco.

12              In April of 2010, there was an incident of

13  family violence.  Mr. Justice was actually listed as the

14  victim, and he said that Ashley Richards was at his apartment.

15  They got into a fight, because Ms. Richards told Mr. Justice

16  that she wanted to smoke weed.  He told her that she did not

17  want him to smoke weed.  He eventually went out onto the

18  balcony of the apartment.  Ms. Richards Locked him out of the

19  apartment, and Ms. Richards left in Brent's car.  Brent

20  reported his car stolen to the Houston Police Department when

21  the police came to the scene.  The police did observe red

22  marks on Mr. Justice.

23              The case was not pursued, because Mr. Justice

24  did not want to pursue charges on Ashley Richards.

25  Q  And was that location one that you have determined where

1  any of the videos were produced?

2  A  Yes.

3             This occurred at 9898 Forum Park, Apartment

4  6304.

5  Q  And how do you know that there were videos produced at that

6  location?

7  A  Ms. Richards told me about the 9898 Forum Park location,

8  and I went -- I have seen video of 9898 Forum Park, Apartment

9  6304, and it's the same apartment that are in the videos.

10 They match.

11 Q  Okay.

12 A  They match.

13 Q  Okay.  And are there any other instances of domestic

14 violence?

15 A  There's another one on April the 30th of 2010, and again at

16 9898 Forum Park, Apartment 60- -- 6304.

17             The police came to the location and interviewed

18 Justice and Richards.  An argument happened, and they were

19 fighting.  And Mr. Richards told her to leave, but before she

20 left she said that she wanted some money from the closet.

21             They continue to push and shove each other.  Ms.

22 Richards eventually pulled out a knife and pushed it up

23 towards Brent's throat.

24             The police who came to the scene interviewed

25 both.  Ms. Richards admitted that she pulled a knife out and

1  pointed it at Mr. Justice.

2              Mr. Justice did not want to pursue charges, so

3  the officers allowed Ms. Richards to leave the -- leave the

4  apartment that day.

5  Q  Any other incidents where she's had contact with law

6  enforcement that you're aware of?

7  A  Yes.  There's one more.

8              On August the 15th, 2012, the police responded

9  to 13919 Locke Lane.  They had a report that the people who

10 were living at 1391- -- 919 Locke Lane were stealing

11 electricity from a neighbor.

12             The police came to the scene and saw an

13 electrical cord that was running from 13919 Locke Lane, which

14 is where Justice and Richards lived, and it was running to the

15 neighboring house.

16             When the police department went into the yard to

17 investigate, someone inside the house threw the electrical

18 cord -- electrical cord out into the yard.  The police knocked

19 on the door to try to get the occupants to come out, and they

20 did not.

21 Q  Now, other than the incident with the knife where Ms.

22 Richards pulled -- pulled a knife on Mr. Justice and the

23 violence against law enforcement, are you aware of Ms.

24 Richards ever brandishing a weapon in public?

25 A  Yes.

1   Q   Can you describe that incident to the Court, please?

2   A   I interviewed the apartment manager at 9898 Forum Park when

3   I went in there to locate the leasing agreement that she had

4   had, and the apartment manager said, oh, I remember Ashley

5   Richards.  You know, she was the mean one.  And I asked her

6   what she meant by that, and she said that she -- Ashley was in

7   the parking lot and she had a gun.  And she was waving it

8   around in public.

9   Q   Did you find a gun when you searched the Locke Lane

10  residence?

11  A   Yes.

12  Q   And to whom did that gun belong?

13  A   Ashley Richards.

14  Q   How do you know that?

15  A   In one of the email accounts that we searched, there is a

16  handgun transfer form from a man named Derrick Connelly

17  (phonetics), and the gun was transferred to Ashley Richards.

18  Q   And did you take that weapon in your search?

19  A   Yes.

20  Q   Okay.

21             Now, as far as Ms. Richards, were you able to

22  find any employment history through Texas Workforce or any of

23  your investigation?

24  A   No.

25  Q   And are you aware of whether or not she has any family in

1  the Houston area?

2  A  No.

3  Q  How do you believe she supported herself?

4  A  There was an advertisement on the internet on the back page

5  where she advertised her -- that she provided Thai massages,

6  and during conversations that I had with her she also told me

7  that she was able to earn money through babysitting and hair

8  cutting.

9  Q  Does Ms. Richards hold either a license to cut hair or

10  perform massages from the State of Texas?

11  A  No.

12  Q  Were you able to determine that she was receiving money

13  from the making of these videos?

14  A  Yes.

15  Q  Did you ever have the opportunity to interview any of the

16  individuals that purchased these videos?

17  A  Yes.

18  Q  And did they indicate that they paid for the videos and

19  were provided with videos explicit to the instructions they

20  gave?

21  A  Yes.

22  Q  Do you believe based on your investigation that Ms.

23  Richards is a danger to the community?

24  A  Yes.

25  Q  Do you believe that she has a -- demonstrated violent

1  behavior consistent with someone that could cause harm to

2  persons or property?

3  A   Yes.

4  Q   In your investigating this case, did you have an

5  opportunity in working with the FBI to review any studies that

6  the behavior analysis unit provided concerning the -- I guess,

7  the history of a link between cruelty to animals and violence?

8  A   Yes.

9  Q   And what did those studies show?

10 A   The study indicated that animal abusers are more likely to

11 have a criminal record and to commit a violent crime later in

12 life.

13 Q   Now, let's talk about Mr. Justice's criminal history.

14              Does Mr. Justice have a criminal history?

15 A   Yes.

16 Q   And can you describe that for the Court?

17 A   Again, would you like to go chronologically?

18 Q   If that's the easiest way for you, absolutely.

19 A   Okay.

20              I have records from the Huntsville Police

21 Department that on January the 16th, in 1990, he was arrested

22 for criminal trespass and resisting arrest.

23              I also have information from the Huntsville

24 Police Department that on October the 24th, 1991, that he was

25 arrested again for criminal trespass.

1    The Huntsville Police Department arrested him

2 again on February the 19th, 1992, for a warrant that was for

3 criminal trespass.  He eventually pled guilty to that and paid

4 a three hundred dollar fine.

5    In May 23rd of 2000, he was involved in a

6 domestic disturbance with his wife, who was not Ashley

7 Richards.  There was an argument between he and his wife.

8 According to the report provided by Precinct 4, Constable's

9 Office he hit her with a three feet towel rack on the head,

10 and it caused a one inch knot on her forehead.

11    He eventually convicted to lesser offense of a

12 Class misdemeanor instead of the Class A assault that he was

13 originally arrested for.

14    In March of 2004, he was filed on for auto

15 theft, where he obtained a car from Landmark Chevrolet and

16 Landmark Chevrolet gave him the car on the condition that his

17 credit was good.  Landmark Chevrolet learned that his card

18 wasn't.  He was sent a demand letter to return the car, and he

19 didn't.  So, he was eventually filed on for the auto theft.

20    In March of 2004, Mr. Justice went to his

21 employer to obtain his paycheck.  His employer said that Mr.

22 Justice did not complete the job, so he did not want to pay

23 him.  The police were called.  When the police were called,

24 both Mr. Justice and the complainant ended up being arrested

25 for outstanding warrants.

1      That case about the paycheck was referred to as

2  a civil matter, so the police didn't get involved in that.

3      In November of 2004, Mr. Justice was arrested at

4  Intercontinental Airport, because he did not follow --

5  originally, he did not follow the TSA's instructions at the

6  airport.  There was an argument between Mr. Justice and the

7  TSA agent and he eventually shoved the TSA agent at the

8  airport.

9      He was arrested by the Houston Police Department

10  and charged with a Class C assault.

11      In April of 2006, Mr. Justice was with a

12  girlfriend, who is not Ashley Richards, but her name is also

13  Ashley.  They got into an argument because he refused to leave

14  her apartment.  She claimed that he pushed her.

15      Mr. Justice left the -- left the apartment

16  before the police arrived.  Again, the complainant did not

17  pursue the criminal charges.

18      In June of 2007, Brent's -- Mr. Justice's

19  daughter said that she was assaulted by him.  She claimed that

20  he grabbed her, knocked her into a wall, scratched her and

21  held her against her will.  She was able to call the police

22  after Mr. Justice left the house.  When the officers came to

23  the location, they did observe bruises and scratches on his

24  daughter, who at the time was eighteen years old.  And that

25  was in 2007.

1    In February of 2008, there was another family

2 violence incident between him and his girlfriend Ashley

3 Douglas.  Again, they had an argument.  She wanted him to

4 leave her apartment.  She claimed that she was pushed and

5 grabbed.  She eventually had to bite him to get him off of

6 her.  He told the police that he was staying with her because

7 he had no place to go.

8    The District Attorney's office refused charges

9 in that case because of conflicting statements, and the

10 District Attorney found that it was mutual combat.

11    THE COURT:  Okay.

12    Ms. Zack, we're just going to take just a brief

13 recess, and then we'll get started, just about three to five

14 minutes.

15    Okay?

16    MS. ZACK:  Yes, Your Honor.

17    THE COURT:  Counsel.

18  (Recess taken at 11:10:17 a.m.)

19  (Proceedings resumed at 11:15:05 a.m.)

20    THE COURT:  Please be seated everyone.

21    Ms. Zack, you may continue when ready.

22    MS. ZACK:  Thank you.

23 BY MS. ZACK:

24 Q  I believe you were reviewing for the Court the criminal

25 history you have for Mr. Justice.

1        Do you recall where you left off?

2   A  Yes.

3        There was another Houston Police Department

4   report from March of 2008, where Brent's employer accused him

5   of paying his personal bills from company money.

6        Brent was fired.

7        The complainant wanted to prosecute and press

8   the charges but the case was not investigated by our forgery

9   division.

10        In March of 2008, Mr. Justice and his girlfriend

11   Ashley Douglas had an argument in a grocery store.  He said

12   that she hit him and shoved him, and she said that he shoved

13   her in the grocery store.

14        The police were called, but since there were no

15   injuries and, again, conflicting statements, there was no

16   arrest.

17        In February of 2009, an apartment complex

18   manager called the Houston Police Department to the location.

19   They claimed that they had a criminal trespasser in one of the

20   apartments.  The apartment manager said that the -- there was

21   not supposed to be an occupant in a particular apartment, but

22   there was someone inside.

23        The police department went to that apartment.

24   They saw that the deadbolt was -- the door handle was missing

25   but the deadbolt was Locked.  The police later learned that it

1  was Brent Justice who was inside the apartment.  It was his

2  daughter's apartment, and he claimed that he didn't know that

3  she had been evicted from the apartment.

4            But in this incident, he refused to come out

5  initially when he was asked by the Houston Police Department,

6  so time passed until a supervisor -- a supervisor actually had

7  to come to the scene, and eventually Brent came out of the

8  apartment.

9            In March of 2010, Brent's employer accused him

10 of forging four checks totaling three thousand seven hundred

11 and seventy-three dollars.  Three of the four checks were

12 actually made out to Brent Justice.

13           Brent was fired, and again, this case was not

14 investigated by the forgery division.

15           In May of 2011, there was an incident where Mr.

16 Justice threatened his brother's ex-wife.  He -- Mr. Justice

17 called her and said, hey, I'm going to come over there and I'm

18 going to kill you.

19           The argument stemmed over a benefit's check that

20 complainants ex-husband was supposed to receive.

21           The complainant in this case described him as a

22 scammer and capable of hurting someone, and she talked to our

23 family violence unit about Mr. Justice because she was afraid

24 -- she was afraid of him, but charges on the threat were never

25 prosecuted, but there were two additional witnesses in this

1  case but it was not -- it wasn't prosecuted.

2              And that's the last report that I have.

3  Q  Do you have any indication in your records that he has ever

4  failed to appear for a court appearance?

5  A  I do.

6              There is a -- a 2006 case where he was out on

7  bond for a theft, and he failed to appear and his bond was

8  forfeited and he was arrested the next day and then eventually

9  served seven months for that offense.

10 Q  Now you've talked about several incidents where it appears

11 he has stolen from employers.

12             Do you have any significant work history on Mr.

13 Justice?

14 A  No.

15 Q  Other than employers reporting that he has stolen from

16 them, are you aware of any legitimate employment that he has

17 ever had through Texas Workforce?

18 A  No.

19 Q  And at the time of the searches, were there computer

20 searches that indicate that he's had contact with foreign

21 countries?

22 A  Yes.

23 Q  Can you describe those emails or contacts to the Court?

24 A  There were numerous emails where Mr. Justice had contact

25 with African American women in African countries.

1          He specifically was talking to one woman in

2     Ghana and in their email communications, which were fairly

3     lengthy, they discussed him going to Ghana and being with her.

4          They actually referred to each other as wife and

5     hus- -- wife.  She refereed -- he referred to her as his wife,

6     and there were many communications about that, as well in

7     those communications, they talked about crush videos and her

8     making crush videos for him.

9     Q  Now in the incidents that you reported to the Court about

10    domestic violence between Mr. Justice and Ms. Richards, at the

11    time of those incidents did they indicate what the nature of

12    their relationship was to law enforcement?

13    A  The report -- some of the reports will indicate that they

14    say that they're boyfriend and girlfriend.

15    Q  And does -- when you interviewed Ms. Richards what did she

16    tell you the nature of their relationship was?

17    A  That they were just friends.

18    Q  Are you aware of at least three different locations,

19    however, where they live together?

20    A  Yes.

21    Q  And when you were at the Locke Lane address, how many

22    bedrooms were there?

23    A  There were three.

24    Q  And does it appear -- how many did it appear were being

25    slept in?

1  A  At least two because they had a visitor.

2  Q  Okay.  And did you come in contact with the visitor?

3  A  Yes.

4  Q  And who was the visitor?

5  A  Ashley says that that was her brother.

6  Q  Did it appear to you that Ms. Richards and Mr. Justice were

7  involved in a romantic relationship?

8  A  I never saw any communications that would suggest that.

9  The only way that I know that is from the offense reports

10  where they list each other as boyfriend and girlfriend.

11  Q  Okay.  And the offense reports, those are from the domestic

12  violence incidents that we've --

13  A  Yes.

14  Q  -- already discussed?

15            Okay.  Now, as far as the danger to the

16  community aspect, do you believe based on what your

17  investigation has shown as to Mr. Justice that he poses a

18  threat to persons or property?

19        MR. GALLAGHER:  I object, Your Honor.

20            This calls for opinion.

21            I mean, she's already testified to the facts.

22            As far as the judgment on that question, that's

23  to you.

24        THE COURT:  Okay.

25        MR. GALLAGHER:  Her opinion's not relevant.

1              THE COURT:  I agree.

2                    The objection is sustained.

3    BY MS. ZACK:

4    Q  Besides the -- well, let me phrase it this way then.

5                    The Defendant, Mr. Justice, have you -- you are

6    aware of incidents of violence in which he's participated,

7    correct?

8    A  Yes.

9    Q  Were there weapons found in his home?

10   A  Yes.

11   Q  Can you describe those weapons to the Court?

12   A  I found the handgun and I find -- and I found numerous

13   knives inside the -- at the residence.

14   Q  Okay.

15                    And the knives that you found some of those are

16   visible in the Government's exhibits?

17   A  Yes.

18   Q  Those are the ones on the hearth, correct?

19   A  Yes.

20             THE COURT:  Can I just interrupt?

21                    Are these at the homes that are shared by Ms.

22   Richards and Mr. Justice?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Okay.

25                    I'm sorry.

 1            MS. ZACK:  I apologize for not making that clear,

 2    Your Honor.

 3            THE COURT:  Okay.

 4    BY MS. ZACK:

 5    Q  And this is at the address, the Locke Lane address, the

 6    last address that you have them living together?

 7    A  Yes.

 8    Q  In the videos where you hear a male voice and you indicate

 9    that sometimes the male voice is giving instructions, are any

10    of those instructions to commit acts of violence?

11    A  Yes.

12    Q  And -- to direct further violence or to do certain acts?

13    A  Yes.

14    Q  And does the person making those comments provide further

15    weapons in several of those videos to Ms. Richards?

16    A  Yes.  He did in *Puppy* -- in the *Puppy* 2 video.

17    Q  Okay.

18                And --

19            MS. ZACK:  Nothing further at this time, Your Honor.

20            THE COURT:  Okay.

21            Mr. Gallagher, cross examination?

22            MR. GALLAGHER:  Thank you, Your Honor.

23                        CROSS EXAMINATION

24    BY MR. GALLAGHER:

25    Q  Well, let's start from close to where you finished.

1          Ms. Zack was asking about the weapons found at

2    Locke Lane, right?

3    A  Yes, sir.

4    Q  And -- so, it's your understanding that both Ms. Richards

5    and Mr. Justice had been living there, right?

6    A  Yes.

7    Q  And at the time the Houston Police did a search of that

8    property her brother was actually in the house that morning,

9    correct?

10   A  Yes.

11   Q  And so, he would have been -- that -- and that was around

12   the time -- that was in August of this year, correct?

13   A  Yes.

14   Q  And that's the same month that the incident regarding the

15   stealing of electricity was going on, right?

16   A  Yes.

17   Q  Okay.

18          And you mentioned that there was a -- for that

19   incident, you mentioned that there was -- there was obviously

20   someone inside, because the -- something had been -- the cord

21   had been thrown out of the house, right?

22   A  Yes.

23   Q  But the police don't know who actually did that, right?

24   A  The police officer who was there saw a female inside the

25   house.

1  Q  Oh, so it was a female?

2  A  Yes, sir.

3  Q  Thank you.

4            Okay.  And back to that property, Ms. Zack just

5  asked you about some of the weapons found during the search of

6  that property, right?

7  A  Yes, sir.

8  Q  You mentioned the handgun, right?

9  A  Yes.

10 Q  And it's your belief that was -- you have records showing

11 that that had been provided to Ms. Richards, right?

12 A  Yes.

13 Q  Okay.  And you mentioned some of the knives and other

14 instruments you found, correct?

15 A  Yes.

16 Q  And you said some of those had been used in the videos,

17 right?

18 A  Yes.

19 Q  Is there any depictions of -- is there evidence that any of

20 those weapons were used to threaten or harm persons?

21 A  Not that I'm aware of.

22 Q  And you went through what you knew of Ms. -- what your

23 understanding of Mr. Justice's criminal history.

24            Is it correct that the last -- you mentioned a

25 forgery in 2010.

1          There was no conviction for that, right, forgery

2  investigation in 2010?

3  A  No, sir.

4  Q  Okay.

5          And the criminal trespass in 2009 investigation,

6  no conviction for that, right?

7  A  No.

8  Q  Okay.

9          Or -- or actually answer either of those, as

10 long as you're asked, any charges filed as to either of those?

11 A  No.

12 Q  Okay.

13         The 2008 food store incident you mentioned, any

14 charges or convictions based on that conduct?

15 A  No, sir.

16 Q  Okay.

17         There was an employment -- an accusation from an

18 employer that he had stolen money -- I forget -- but that was

19 about 2007; is that correct?

20 A  Yes, sir.

21 Q  Okay.

22         And no charges or a conviction in that either,

23 right?

24 A  Correct.

25 Q  All right.  Just to cut this short, so the last conviction

1  I think you mentioned in 2006.  Was there a conviction?

2  A  There was the conviction in 2004 at the airport, the

3  incident at the airport.

4  Q  Okay.

5           So what -- what's the -- okay.

6           So, 2004 there was -- and that was -- what

7  evidence -- what was the conviction for on that?

8  A  That was for the assault against the TSA employee.

9  Q  You actually know what he was convicted of?

10  A  Class C assault.

11  Q  Class C?

12  A  Yes, sir.

13  Q  Misdemeanor?

14  A  Yes.

15  Q  Okay.  I thought you mentioned a bond being forfeited in

16  2006 and that a conviction resulted in relation to his

17  charges.  Is that correct?

18  A  Yes -- yes.

19  Q  And I'm sorry.

20           I'm kind of -- I know I'm rushing through

21  different documents.  Just take your time.

22  A  Uh-huh.  Yeah.

23           Yes.  It was a 2006 auto theft case, I believe.

24  Q  Okay.

25           So, that's what the conviction was for was auto

1  theft?

2  A  Yes.

3  Q  Okay.

4            No conviction for bond jumping, failure to

5  appear --

6  A  I'm not aware if he was convicted for the -- I don't -- I'm

7  not sure if that was ever charged, but I do know that the bond

8  was forfeited, that he was convicted of the theft.

9  Q  Okay.

10            Oh, okay.  So, sitting here today, you don't

11  recall whether he's even charged with failure to appear, much

12  less convicted of that?

13  A  Right.  The bond was just forfeited.

14  Q  Okay.

15            So, it was the auto -- that was the 2006 auto

16  theft.

17            So, that's the most recent conviction you're

18  aware of, right?

19  A  Correct.

20  Q  And what was the sentence on that?

21  A  Seven months, I believe.

22  Q  Was that a felony conviction or a misdemeanor conviction?

23  A  I am not sure.

24  Q  Okay.

25  A  Because I know he did seven months in the Harris County

 1   jail.

 2   Q  But that could be either, right?

 3   A  Right.

 4   Q  No problem.  I don't mind you even checking your documents,

 5   if you want to.

 6   A  I was looking for that one bond to see if it was on there.

 7   Q  Sure.  Take your time.  Just tell me when you're done.

 8   A  Oh, it may be it --

 9           You know what?  I'll look in his.

10      (Pause in the proceedings.)

11           THE WITNESS:  I'm sorry.

12              You were asking -- you were talking about the

13   theft, right, in 2007?

14   BY MR. GALLAGHER:

15   Q  Right.  The one that -- you said during the course of which

16   at some point --

17   A  Uh-huh.

18   Q  -- there was a forfeiture of bond.

19   A  That should -- that bond forfeiture shows up in the Harris

20   County JIM System, and it's not showing up on the -- on the

21   Department of Public Safety's report that I have in front of

22   me, but it is showing in the Harris County JIM system, which

23   is their Justice Intact Management system for tracking the

24   offense.

25   Q  Okay.

1          And well, looking at those documents can you

2 tell whether he's actually convicted of a misdemeanor or a

3 felony?

4 A  I don't have it in front of me, so I don't want to say

5 anything that's not correct.

6 Q  Right.  No.  I'm fine.

7          But just now, you just don't recall?

8 A  Correct.

9 Q  All right.

10          I'm not going to -- I'm not going to ask

11 any more questions about his criminal history, if you want --

12 unless you're still looking for documents.

13 A  Oh, no.  Go ahead.  I'm ready.

14 Q  Okay.

15          You testified about a distinction in law between

16 hard and soft crush videos, right?

17 A  Yes.

18 Q  Okay.  And it was your understanding that soft -- what you

19 termed soft crush videos are legal and hard are illegal,

20 correct?

21 A  Correct.

22 Q  All right.  Is that distinction federal law?

23 A  Yes.

24 Q  Where is that?

25 A  I don't know where it's specifically located, but the -- in

 1  the federal law, it just refers to the larger animals, like

 2  the mammals and the dogs and the cats.

 3  Q   Okay.  And so, that's the only difference -- in your

 4  understanding the only difference between the hard and the

 5  soft videos is the size of the -- the size and nature of the

 6  animals involved?

 7  A   Correct.

 8  Q   You talked about the videos *Puppy* 1 and *Puppy* 2, right?

 9  A   Yes.

10  Q   Do you know when those were made?

11  A   They lived -- or they occupied the unit at 17435 Imperial

12  Valley in 2011.

13            I have reports from the apartment complex that

14  are dated June 16th, 2011 and August the 1st, 2011, so they

15  were made some time within that lease period.

16  Q   Oh, okay.

17            So you think they first -- it's your

18  understanding that they first came to that Imperial Valley

19  address in June 2011?

20  A   I'm not -- I'm not for certain.  The apartment complex

21  switched owners, and they did not have the lease agreement for

22  that apartment.  But they did have the work orders where Ms.

23  Justice actually submitted some work orders for the apartment

24  for like a non-working dishwasher.

25  Q   Okay.  So, those would think she was living there -- those

 1  would indicate she was living there at a particular time but

 2  not when she took possession of the residence, right?

 3  A  I don't know when she actually took possession.

 4  Q  Okay.

 5              So, when you -- so let me ask you this again --

 6  let me ask -- so when I -- I asked you if you know when the

 7  videos were made, and you responded that you believed they

 8  were living in this particular place in June 2011, correct?

 9  A  Right.

10  Q  Do you have any other basis to think the videos were made

11  then?

12  A  I believe they were made on or about that period sometime

13  in June, August 2011, based on the work orders that were

14  submitted to the apartment complex --

15  Q  Okay.

16  A  -- that she was living there, yes.

17  Q  Well, I guess what I'm trying to figure out is I understand

18  -- so we can -- what you're saying it seems -- you seem like

19  you have reason to believe from 2011 until some point forward

20  she was living there.

21              Why wasn't she -- why was she not living there

22  in May, April or March?  Do you have any evidence where they

23  living then?

24  A  I'm not sure.  No.

25  Q  And the videos described in Count 2, *Whitechick* 1, 2, and

1  3, when were those made?

2  A  Those would have made -- been made between February 22nd,

3  2010 and February 28, 2011.

4              There was a -- there's a lease agreement that

5  said that they took possession of that property on February

6  the 22nd, and then they -- the lease ended on February 28th, so

7  that -- the video would have been made some time in that time

8  period.

9  Q  Okay.  And what -- what's the street address on that

10 property?

11 A  9898 Forum Park.

12 Q  Okay.  So, *Puppy* 1 would have been Imperial Valley based on

13 your view of the evidence in Count -- *Whitechick* would have

14 been -- I'm sorry -- Forum Park?

15 A  Yes, sir.

16 Q  Thank you.

17              Have you -- and you may have said this.  I'm

18 Sorry.  But there's just been a lot of information.

19              Have you examined the apartment unit where they

20 had resided in Forum Park?

21 A  Yes.

22 Q  Okay.

23              And how about when -- what -- when do you think

24 the video *Black Love Sample* was made?

25 A  *Black Love Sample* was made at 13919 Locke Lane.  And during

 1  my interview with Ms. Richards, she told me that they moved

 2  into that location in November of 2011.  So, it was made

 3  sometime between November 2011 and before they were arrested

 4  on August the 15th.

 5  Q  And I believe -- I may get the words wrong, but I believe

 6  you stated that there was a sexual component to several or all

 7  of these videos charged in the Indictment?

 8  A  Yes.

 9  Q  And you mentioned that Ms. Richards was dressed

10  provocatively in the videos, correct?

11  A  Yes.

12  Q  But she's dressed, right?

13  A  Yes.

14  Q  And is there any -- is there any bestiality in any of these

15  videos?

16  A  No, sir.

17  Q  Any masturbation in these videos?

18  A  No.

19  Q  Okay.  Other than her garb, what makes you say there was a

20  sexual component, if anything?

21  A  I think that the -- it -- the way that she talks to the

22  camera it, you know, it's a -- it would be in like a sexy

23  voice.  It's definitely not a normal voice that you and I are

24  having right now.  It's more of a provocative like, you know,

25  sexy voice.

1  Q  Oh, and you mentioned Mr. Justice having contact with a --

2  internet contact with a person you believe in Ghana, correct?

3  A  Yes, sir.

4  Q  Do you have any reason to believe he has a visa to travel

5  to Ghana?

6  A  I do not know.

7  Q  Do you have any reason to believe he's ever been to Ghana?

8  A  No.

9  Q  Or anywhere in Africa I guess for that matter?

10 A  I don't know.

11 Q  You have no reason to think he has, right?

12 A  No.

13 Q  And during -- well, you've been investigating this, what --

14 you started in August, right, so almost four months?

15 A  Yes, sir.

16 Q  During the course of your investigation, have you had any

17 reason to believe Mr. Justice lives -- has lived within the

18 past decade anywhere outside of Texas?

19 A  Outside of Texas?  No, not to my knowledge.

20 Q  Or that he has substantial assets --

21 A  No.

22 Q  -- anywhere?

23 A  Not that I know of -- unless -- there is an email that is

24 from Mr. -- Mr. Richards to one of the women in Ghana where he

25 told her that he owns a business and reports through his

 1   financial advisor, so it -- you know, I have no way to

 2   substantiate that story.

 3   Q   Well, you just said Mr. Richards.

 4   A   I'm sorry.  Mr. Justice -- I'm so sorry.

 5   Q   Okay.  I'm sorry.  I just want to be clear.

 6                 Okay.  So, there's one email where he speaking

 7   to a potential partner in Ghana about assets, but --

 8   A   Right.

 9   Q   -- we don't know anything -- you don't want to revise that.

10   A   Correct.

11   Q   In regarding the -- Mr. Justice's criminal history -- I'm

12   sorry -- yeah, Mr. Justice's criminal history over the past

13   decade that you discussed, in any of the assaults, even in the

14   police reports, is there any allegation of him using a firearm

15   to threaten another?

16   A   No.

17   Q   Using a dangerous weapon to threaten another?

18   A   No.

19   Q   And he's currently -- there are currently charges faced --

20   he's pending in Harris County, correct?

21   A   Yes.

22   Q   And those are arising out of the same investigation, right?

23   A   Yes, sir.

24          MR. GALLAGHER:  I pass the witness, Your Honor.

25          THE COURT:  Okay.

 1              Before we begin the next cross examination I

 2   just want to clarify two things.  Maybe, Ms. Zack, you can

 3   help me with this.

 4              With respect to the gun, the gun is owned by Ms.

 5   Richards, not Mr. Justice, right?

 6         MS. ZACK:  That is our understanding, but was found

 7   in the home they shared.

 8         THE COURT:  Okay.

 9              And then, finally, with respect to Mr. Justice's

10   passport status, have we been able to confirm whether or not

11   he does or does not have a passport?

12         MS. ZACK:  It's my understanding from the Pretrial

13   Services Report that he does not.

14         THE COURT:  Okay.

15              But that's never been verified, right?

16         MS. ZACK:  Right.

17         THE COURT:  Oh, okay.

18         MS. ZACK:  I don't know what Pretrial Services does

19   to verify anything.

20         THE COURT:  Okay.

21         MS. ZACK:  That's based on his statement to them, I

22   believe.

23         THE COURT:  Mr. Hernandez, is there any -- been any

24   verification of his passport status?

25         MR. HERNANDEZ:  Your Honor, it -- it would be on his

1  statement alone.

2          THE COURT:  Okay.

3              And the same with Ms. Richards?  Is there any

4  verification of her passport status?   Yes or no?

5          MR. HERNANDEZ:  I do not -- let's see.

6              She indicated she does not possess a passport.

7          THE COURT:  Okay.

8              But again, that has not been verified other than

9  her statements?

10         MR. HERNANDEZ:  Other than their statements, Your

11 Honor.

12         THE COURT:  Okay.  Great.

13             I'm sorry, Ms. Zack.  I just wanted to clarify

14 that.

15         MS. ZACK:  No problem, Your Honor.

16         THE COURT:  Okay.

17             Ms. Raynor?

18         MS. RAYNOR:  Okay.

19             Thank you, Your Honor.

20                      CROSS EXAMINATION

21 BY MS. RAYNOR:

22 Q  Officer, Hollifield?

23 A  Yes, ma'am.

24 Q  No relationship --

25 A  No.

1  Q  Okay.  Thank you.

2          You were assigned this case in August of this

3  year, correct?

4  A  Yes, ma'am.

5  Q  But the investigation has been ongoing prior to your being

6  assigned to it.  Is that correct?

7  A  Did it -- did the Houston Police Department investigate it

8  before I got it?

9  Q  That's correct.

10 A  No, ma'am.

11 Q  There's an offense report created with respect to these

12 offenses, correct, by the Houston Police Department?

13 A  Yes, ma'am.

14 Q  And have you seen that offense report?

15 A  That really thick one right there?

16 Q  Yes, ma'am.

17 A  Yes, ma'am.  I wrote the majority of that one.

18          MS. RAYNOR:  May I approach the witness, Your Honor?

19          THE COURT:  Oh, yes, you may.

20 BY MS. RAYNOR:

21 Q  I just want to review the offense report that was given to

22 me by the prosecutor.  Is there a begin date when --

23 A  Yeah.  Do You understand what our begin date means?

24 Q  I do not.

25 A  Okay.  A lot of times I get police reports, and I don't

1  understand them either on the begin date.

2          The Houston Police Department tracks the begin

3  date by what we believe is the start of the actual offense, so

4  that the -- we believe that we have some videos from places

5  where they live.  We determine that date based on where some

6  of the videos, we believe, were made.

7  Q  Okay.  And that date would be?

8  A  The June 16th, 2011.

9  Q  Thank you.

10          So, you believe the offenses began --

11 A  On or about.

12 Q  -- on or about --

13 A  I mean, I'm not -- it's not specific -- I mean, it's not a

14 certain date.  It's on or about.

15 Q  Okay.

16          But there is no -- what leads you to believe?

17 What evidence leads you to believe it began on or about June

18 16th, 2011?

19 A  Well, we have videos -- Ms. Richards lived at three

20 different locations that I'm aware of where the videos were

21 made, and on June 16th, 2011, she would have been living at

22 9898 Forum Park.  And there were videos that were made at 9898

23 Forum Park.

24 Q  Okay.  I thought your earlier testimony was that she lived

25 at Imperial Valley on June 16th, 2011?

 1  A  She lived -- you're -- you're correct.

 2                She lived -- she lived at the -- the Springfield

 3  at City View apartment complex from June 16th, 2011 through

 4  August the 1st, 2011, that we have dates.  We have work orders

 5  from that apartment complex during that date.

 6  Q  Okay.

 7                But no leases?  You have dates of work orders.

 8  A  Correct.  We don't have a lease from that location.

 9  Q  Okay.

10                And was there a lease from the Forum Park

11  location when she lived there in February of 2010 to February

12  2011?

13  A  Yes.

14  Q  There's a lease?

15  A  Yes.

16  Q  With whose name on it?

17  A  Ashley Richards.

18  Q  Only?

19  A  I can't recall if his name was listed on there or not.

20                I don't have the lease with me today.

21  Q  Okay.

22                Are you aware of Ms. Richard's age?

23  A  Yes.

24  Q  She's a twenty-two year old woman?

25  A  Correct.

 1  Q  So in 2010, two years ago, she would have been twenty?

 2  A  Uh-huh.

 3  Q  Okay.  And when did she live at Locke Lane?  That's the

 4  most recent address, correct?

 5  A  Yes.  During my interview, she told me that she moved in

 6  there in November of 2011.

 7  Q  And is there a lease for that apartment?

 8  A  No, ma'am.

 9  Q  No lease?

10  A  She told me that she did not sign a lease.  It was an

11  agreement that she had with the owner of the property.

12  Q  Okay.  And is it your -- is it your belief that Mr. Justice

13  and Ms. Richards lived at each one of these locations?

14  A  Yes, ma'am.

15  Q  Are you aware of Mr. Justice's age?

16  A  Yes.

17  Q  How old -- how old a man is he?

18  A  He's fifty-one.

19  Q  So, he's approximately thirty years older than Ms. --

20  A  Yes.

21  Q  -- Richards, right?

22  A  Yes, ma'am.

23  Q  And the nature of their relationship is what?

24  A  In some of the -- the Houston -- some of the Houston Police

25  Department reports they will list each other as boyfriend and

 1  girlfriend.

 2              Do I know the exact nature of their

 3  relationship?  I don't know because Ashley described him as

 4  her friend.

 5  Q  Okay.  The owner of the Locke Lane -- is that an apartment

 6  or a house?

 7  A  It's a house.

 8  Q  The owner of the house, is that Derrick Connelly?

 9  A  Yes.

10  Q  And he -- do you know what age a man he is?

11  A  He's older.  I'm not for sure how old he is, but I remember

12  he is an older gentlemen.

13  Q  Would you say he's above fifty?

14  A  I think -- I believe so.

15  Q  Would you say he's above fifty-five?

16  A  I don't know.

17  Q  Is he a black male?

18  A  I believe he's white.

19  Q  Okay.  And you've -- you believe he's the owner of the

20  house?

21  A  Yes.  According to the Harris County Appraisal District

22  records, he was listed as the owner.

23  Q  Okay.  And she's a resident at the house?

24  A  Correct.

25  Q  I -- when I say she, I mean Ms. Richards is a resident at

1  the house.

2                  Do you know the nature of Mr. Connelly's

3  relationship with Ms. Richards?

4  A  I don't know what their full relationship is.  I know that

5  he provided her money based on some emails that we found in

6  her email account, so -- but I don't know the -- I don't know

7  the exact -- the exact nature of it, no.

8  Q  Is that odd that a homeowner would provide money to someone

9  who's not paying them rent in their home?

10                 MS. ZACK:  Objection --

11                 THE COURT:  Objection.  It calls for speculation.

12                 Objection sustained.

13 BY MS. RAYNOR:

14 Q  You also said that Mr. Connelly had -- was the prior

15 registered owner of the gun that Ms. Richards allegedly waved

16 in some apartment complex -- at some apartment complex?

17 A  No.  I do not know if that's the same gun.

18 Q  Okay.  But whatever gun that she allegedly waved, was that

19 a -- the prior owner was Mr. Connelly?

20 A  I don't know who the prior owner of the gun was.  The

21 transfer form that I saw was just A transfer from, you know,

22 Mr. Connelly to Ashley.  So, I guess he -- and -- to answer

23 your question, yes, He would be the previous owner of the gun.

24 Q  Okay.

25                 And what year was that transfer made?

 1  A  I don't have that form in front of me so I don't want to

 2  give you an incorrect date.

 3  Q  Okay.  Where did you locate the transfer form?

 4  A  In -- we search several search warrants on many email

 5  accounts that belonged to Ms. Richards, and we found them --

 6  we found that form in one of the email accounts.

 7  Q  Okay.

 8  A  It was an email.  It -- the email included an attachment

 9  with that form.

10  Q  Oh, okay.

11                  The form was an attachment in the email?

12  A  Yes, ma'am.

13  Q  Okay.  When you say the email belonged to Ms. Richards, how

14  do you know that?

15  A  By her own admission -- the cruelmeshallet she -- she --

16  she provided several email addresses to me that she was the

17  owner of, like cruelmeshaller2010.

18  Q  Can you spell that for me?

19  A  C-R-U-E-L --

20  Q  Okay.  Cruel -- I thought you were saying crew all this

21  time.

22  A  Cruel, cruel.  Yeah, C-R-U-E-L.

23  Q  Cruelmeshallet?

24  A  M-E-S-H-A-L-L-E-T 2010@yahoo.com was one of the emails

25  addresses.

1  Q  Okay.

2                     And in that -- perhaps in that particular -- an

3  email registered to that address?

4  A  It was one -- I'm not -- I can't be for certain which email

5  address that form was found in, because we served search

6  warrants on a couple different email accounts, but it did come

7  from one of them.

8  Q  Okay.

9                     Okay.  Do you remember in that particular email

10 when the transfer was made whether there was any notation as

11 to why the gun was being transferred to her?

12 A  No, ma'am.

13 Q  Okay.

14                     And was the subpoena of the email addresses done

15 after the arrest?

16 A  It was after the search warrant, and, yes, it was done

17 after the arrest.

18 Q  Okay.

19                     Okay.  You talked about -- you testified earlier

20 about Ms. Richard's criminal history.  Can I take you back

21 there, please?

22 A  Yes.

23 Q  Am I correct to surmise that Ms. Richards has but one

24 criminal conviction on her record?

25 A  Correct.

1  Q  And that would be criminal trespass.  Is that correct?

2  A  Yes, ma'am.

3  Q  Is that a Class C, or A or B misdemeanor?

4  A  I believe that's a Class B.

5  Q  So, it was in the State of Texas, right?

6  A  Yes.

7  Q  A Class B misdemeanor?

8  A  Yes, ma'am.

9  Q  You said that she got probation for that; isn't that

10 correct?

11 A  Yes.

12 Q  Is there any indication -- do you have any evidence to show

13 that she successfully completed that probation?

14 A  Yes.  She successfully completed the probation.

15 Q  Okay.

16              Are there any indications that she had any

17 failures to appear or report to her Probation Officers during

18 the time she was on probation?

19 A  Not to my knowledge.

20 Q  Okay.

21              Do you have any evidence to show that in her

22 history, any of her history, that she's failed to appear for

23 any court appearance?

24 A  No.

25 Q  Okay.

 1                    So, all the other things that you testify when
 2    you say she had contact with the police, she had contact with
 3    the police, those are not necessarily -- those are not
 4    criminal arrests?
 5    A  No.  Those are just contacts with law enforcement.
 6    Q  Okay.
 7                    Okay.
 8                    THE COURT:  Can I just ask a question?  I'm a little
 9    confused.
10                    What is the -- isn't there a felony charge for
11    assaulting a public servant and then resisting arrest?
12                    MS. RAYNOR:  There's a charge -- there are charges
13    that are pending.  That's correct, Your Honor.
14                    THE COURT:  And she was released on bond, and she
15    failed to appear for those charges; is that correct?
16                    MS. RAYNOR:  Well --
17                    MS. ZACK:  The failure to appear is because she was
18    in Harris County custody.
19                    THE COURT:  Oh, okay.
20                    MS. RAYNOR:  Yeah.  Right.
21                    THE COURT:  Okay.
22                    MS. RAYNOR:  For the -- for this case --
23                    THE WITNESS:  Right.
24                    THE COURT:  Okay.
25                    MS. RAYNOR:  -- or a related case.

 1              THE WITNESS:  Correct.

 2              MS. RAYNOR:  Okay.

 3              THE COURT:  So, the felony -- it's not -- it's not a

 4   conviction yet, but there are charges pending?

 5              MS. ZACK:  That is correct, Your Honor.

 6              THE COURT:  Okay.  Got it.

 7                   Okay.  Please continue.  I'm sorry.

 8              MS. RAYNOR:  Thank you.

 9   BY MS. RAYNOR:

10   Q  You also indicated that there is no record with the --

11   A  Texas Work Force Commission.

12   Q  Thank you -- of work history for Ms. Richards?

13   A  Correct.

14   Q  Does the Texas Work Force Commission report all employment?

15   A  No.

16   Q  For instance, self-employment?

17   A  No.  It does not -- it does not report self-employment or

18   people who work for the Government.

19   Q  Okay.  So, if Ms. Richards were actually self-employed,

20   i.e., whether it's a licensed daycare, or babysitting or hair

21   doing or not, that would not be with the Texas Work Force

22   Commission, correct?

23   A  That's correct.

24   Q  Okay.  Is babysitting and hair styling a legitimate form of

25   employment?

1  A  Yes.

2  Q  If -- scratch that.  I'm sorry.

3            Okay.  Your -- the charges that we're here on

4  today stem from the videos, the crush tapes; is that correct?

5  A  Yes.

6  Q  And they -- were those tapes -- were they actual tapes, CD,

7  or downloads from the internet?

8  A  They -- they were found on the internet.

9  Q  So, they were downloaded from the internet?

10  A  Well, the -- the videos were given to PETA, and I do not

11  know how they were transferred to PETA.

12  Q  Okay.

13  A  I'm guessing electronically, but -- so, yes.  They're --

14  they're on the internet.

15  Q  Okay.  And I think you testified earlier that there is --

16  they're found on a website called backpage.com?

17  A  No, ma'am.  The back page, dot -- the back page ad is her

18  ad for her Thai massages that she did.

19  Q  Okay.  And is there a link on her -- on the back page web

20  that link you to her website for these --

21  A  No.

22  Q  -- crush videos?

23  A  The -- the crush videos are totally separate from the back

24  page ad.

25  Q  Okay.

1              So, the website that you obtained the video

2    crush ads from were what website?

3    A  It's www.xxxfetish-media.com.

4    Q  Okay.  X-X-X --

5    A  It's -- the -- on that website, though, those are the only

6    ones that hold the soft crush videos --

7    Q  Okay.

8    A  -- not the hard crush videos.

9    Q  Okay.

10   A  But it's -- so, are you wanting to know the website that

11   holds the soft crush videos?

12   Q  I want to know the website that you found -- that PETA or

13   whoever found --

14   A  The hard crush videos?

15             The hard crush videos were transferred to PETA

16   from an informant.  The informant is from another country.

17   And so, he got the videos from somewhere on the internet, and

18   he forwarded those videos to PETA.

19   Q  Okay.  Thank you.

20             But your testimony about the soft crush video

21   website xxxfetish-media.com?

22   A  Yes, ma'am.

23   Q  What were you about to say about that?

24   A  That's where the soft crush -- the soft crush videos that

25   Ms. Richards had up for sale.

1  Q  Okay.  Okay.

2  A  Those videos are on that website.  That's where you can

3  purchase those.

4  Q  Okay.  Okay.  All right.

5            And those are not illegal?

6  A  No, ma'am.

7  Q  Okay.

8  A  And when you're doing the -- the website address, on the

9  xxx and then fetish, it's dash.  Put a dash between fetish and

10 media.com.

11 Q  Okay.  Thank you.

12       MS. RAYNOR:  No further questions, Your Honor.

13       THE COURT:  Okay.

14            Any follow up, Ms. Zack.

15       MS. ZACK:  No, Your Honor.

16       THE COURT:  Okay.

17            Anything further from this witness?

18       MS. ZACK:  No, Your Honor.

19       THE COURT:  From defense counsel?

20       MR. GALLAGHER:  No, Your Honor.

21       MS. RAYNOR:  Nothing further, Your Honor.

22       THE COURT:  Okay.

23            Ms. Holli- -- Officer Hollifield, thank you very

24 much, ma'am.

25            You may be excused.

1            THE COURT:  Ms. Zack, you may call your next witness.

2            MS. ZACK:  Your Honor, the United States has no

3    further witnesses.

4            THE COURT:  Okay.

5                 Counsel for defense, you may call your first

6    witness, either Mr. Gallagher or Ms. Raynor.

7            MR. GALLAGHER:  I don't have witnesses, Your Honor.

8            THE COURT:  Okay.

9                 Ms. Raynor?

10           MS. RAYNOR:  I don't have any witnesses, Your Honor,

11   but I do -- would like to make a proffer in respect to her

12   aunt and uncles who are present the courtroom.  I've talked to

13   them, as well as her mother, and they've indicated that she

14   has a place to go if the Court would release here either with

15   some terms of conditions of release but that she has a safe

16   environment to return home to, a stable home environment.

17                 She's not from Houston area.  She's from the

18   Waco area, but they -- they would testify that they would

19   report any violations or report that she, you know, where her

20   whereabouts, if need be.

21           THE COURT:  Okay.

22                 Would these aunts and uncles want to put their

23   names on the record as to who they are?

24           MS. RAYNOR:  Yes, Your Honor.

25                 Ms. Richards is -- what's your first name?

1          MS. RICHARDS:  Karla, with a K.

2          MS. RAYNOR:  Ms. Karla Richards.

3          THE COURT:  Okay.

4          MS. RAYNOR:  And --

5          MR. ALEXIS:  Tony Alexis

6          MS. RAYNOR:  -- Tony Alexis and her mother's name --

7    her adopted mother's name is Irma --

8          MS. RICHARDS:  Irma.

9          MS. RAYNOR:  -- Richards.

10         THE COURT:  Okay.

11         MS. RAYNOR:  She's not present in the court today.

12         THE COURT:  Okay.

13         MS. RAYNOR:  She couldn't make the trip.

14         THE COURT:  Okay.  Is there anything else other than

15   the proffer of those witnesses?

16         MS. RAYNOR:  No, Your Honor.

17         THE COURT:  Okay.  Great.

18              Okay.  At this time the Court will hear closing

19   arguments on the detention hearing.

20              Ms. Zack?

21         MS. ZACK:  Thank you, Your Honor.

22              First, we'd ask that Your Honor take judicial

23   notice of the two Pretrial Service Reports that indicate

24   further criminal history for Mr. Justice that was not reported

25   by the officer demonstrating aggravated assaults, for which he

1  was previously convicted and discusses the lack of ties to the

2  community on both their parts.

3          Most interesting in those two reports, before I

4  get to the heart of the matter, is that there seems to be some

5  disagreement among the co-Defendants as to what the nature of

6  their relationship is.

7          Mr. Justice claims that Ms. Richards is his

8  girlfriend.  Ms. Richards claims that she has a boyfriend, who

9  goes unnamed, who is currently incarcerated in the Harris

10 County jail.

11         There is also a discrepancy as to the

12 disposition of the Kia vehicle.  Ms. Richards claims she has

13 no clue what happened to it, and Mr. Justice claims it was in

14 some kind of accident.

15         The inconsistencies among them are troubling in

16 and of themselves, but I would like to point the Court to

17 United States Code section 18 -- I'm sorry -- 18 United States

18 Code section 48, which defines what a crush video is and just

19 tell the Court that the definition is that it is an actual --

20 actual conduct in which non-living human mammals, birds,

21 reptiles, amphibians are intentionally crushed, burned,

22 drowned, suffocated, impaled or otherwise subjected to serious

23 bodily injury, and I believe, Your Honor, that that has been

24 testified here today.

25         I would suggest to the Court that under 18

1  United States Code section 3142(f)(1)(A) that that constitutes

2  a crime of violence based on the definition of crime of

3  violence, under 18 United States Code 3156(a)(4)(A), which

4  states that an offense that has an element of the use of

5  physical force against a person or property is a crime of

6  violence.  Animals are considered, in fact, property, as

7  unfortunate as I believe that is.

8          The Court must consider many different factors

9  under Section 3142(g)(1) when you're looking at whether or not

10 to detain individuals, and that's the nature and circumstances

11 of the crime charged.

12         I don't believe that there's any doubt based on

13 the evidence put forward today that these are horrifically

14 violent, cruel, calculated acts intended to torture and

15 destroy animals for the sexual gratification of others

16 committed by Ms. Richards and being filmed by Mr. Justice.

17         There is nothing in these videos of any

18 redeemable social value in any way, shape or form.  They are

19 absolutely cruel and -- and horrific.  The -- and those are

20 just a sampling of what was found.  And let's discuss where

21 this was found.

22         This isn't that these people are being framed or

23 set up.  These videos were found on a computer in their home.

24 They're linked to email addresses that are tied to both these

25 individuals.  Both of them have admitted participation, though

1 at different levels, in the making of these videos.  It's very

2 clear that it's Ms. Justice -- Ms. Richards in the videos

3 doing this, and we know that Mr. Justice, while he tries to

4 minimize and mitigate in his statement his involvement, he

5 does admit to being the cameraman in the *Puppy Love* videos, as

6 well as in the emails to the individuals in Ghana he talks

7 about animal crush videos.  It's obvious that he has interest

8 in these.

9         Your Honor is supposed to consider the physical

10 and mental conditions of the individuals.  Both individuals

11 appear to have questionable mental status based on the

12 Pretrial Services Report, and I would suggest that the studies

13 from the behavioral analysis unit linking the cruelty to

14 animals to human violence has played out on both their parts.

15 There are several encounters with law enforcement.  There are

16 two domestic violence incidents, and while they didn't result

17 in anyone being arrested, there was physical violence between

18 these two individuals, as well as others.

19         There seems to be a history of disregard for law

20 enforcement and authority.  The charges against Ms. Richards

21 pending in Waco are assaulting a peace officer.  We know that

22 Mr. Justice has prior violent felonies, including a report

23 where he physically abused members of his family, including

24 his daughter.

25         Neither one of them has a verifiable work

1  history.  There is reference that Mr. Justice has lost several

2  jobs based on stealing from his employers.  There is the

3  incident with the gun reported at the apartment complex where

4  they both resided, as well as a gun being found in the home

5  along with many knives, cleavers and machete type objects that

6  were used in the destruction and taking of the lives of these

7  animals.

8          It does not appear, Your Honor, that there are

9  any conditions that would be able to be placed on these

10  individuals that would protect the property of others, that

11  being other animals, as well as other individuals in the

12  community.  Both show a history of violence towards humans, as

13  well as towards animals, and a lack of respect for authority.

14          Mr. Justice has ties via email and phone to

15  Africa.  We have no real significant ties to the community.

16  Neither of them own property.  Neither of them have a job here

17  of any significance that would warrant their staying here.

18  They're not even certain about their relationship to each

19  other.  They have no reason to stick around.

20          They're looking at potentially fifty years in

21  federal prison for these charges, and that is a significant

22  amount of time, whether you're twenty-one years old or fifty

23  years old, and we believe that they will not appear and not

24  stand in front of the Court to face these charges, if they

25  were given any type of bond.

1        They were both in custody in Harris County and

2    were unable to make the bonds that they had been given over

3    there, and I believe that speaks largely to the fact that they

4    don't have support, and while there are people here today,

5    we've been given nothing -- there's nothing in the Pretrial

6    Services Report showing that anyone's willing to put up any

7    significant amount of money or property to assure their

8    appearances.  And there is really nothing for them to do if

9    they're released.

10        They don't have employment to go back to, and we

11   don't believe that the community would be safe or that they

12   would appear.  And we'd ask that you detain them both.

13        THE COURT:  Okay.

14        Thank you, Ms. Zack.

15        Counsel for defense?

16    MR. GALLAGHER:  Thank you, Your Honor.

17        All right.  First, let's quench the mistakes.

18        First, the crime of violence, the Government's

19   right that the Court should consider whether the offense

20   charge is a crime of violence.

21        The Government read off only part of that

22   definition.  The definition is it's an offense that has an

23   element -- the offense of the use -- not the use -- the

24   physical force against the person or property of another.

25        There's been no evidence that any of the

property there and any animals damaged belonged to anyone
else.  Damage to that's -- it clearly says on another.  Damage
to one's own property does not count as a crime of violence.
The Government -- there's been no evidence of that.  This is
not a crime of violence, and so the Court should not consider
that as a factor weighing against Mr. Justice.

Regarding the discrepancies alleged by the
Government, one, I haven't reviewed the co-Defendant's
pretrial report, but as the Government representative, it said
that she indicated that she didn't know what happened to the
Kia.  Mr. Justice said it was totaled.  That's not a
discrepancy.  That's someone not remembering and someone else
telling you what happened.  That's not a discrepancy.

Regarding the difference in the relationship,
that's hardly unsurprising from people who have a long and
obviously contentious dating relationship.  It also doesn't
bear on whether or not they will either appear to court, have
a risk of flight or are a danger to others of the community.

Bond is clearly appropriate in this matter, Your
Honor, for Mr. Justice.  His ties to the community are long
standing and substantial.  As the pretrial report shows, he's
lived here his entire life, which has been a long time now.

He's faced other charges here.  The only charge
for when he was -- which seems to have resulted from any
failure to obey the Court -- was back in 1979.  That's about

1  thirty-three years ago, if my math is correct.

2              The Witness mentioned a failure to appear

3  indication, but -- and more recently, but there was no -- but

4  he -- there was no charge based on that, and we don't know

5  whether he was late for court by ten minutes or whether he --

6  but there's obviously no indication that he fled from that.

7  Indeed, he was convicted on the underlying charge from that

8  case, so that does not indicate a risk of flight either.

9              His daughter, Marissa, is here in the courtroom

10 and is willing to be a surety.  His brother spoke to Pretrial

11 Services about Mr. Justice and his history, as is reflected in

12 the report, and his -- his son-in-law is here in the courtroom

13 also and they are -- they are obviously adults.  His children

14 are adults at this point.

15             The pretrial report also mentions the state --

16 the pending state case as a factor.  The -- that case is

17 related to this.  The likelihood of conviction of that is --

18 the likelihood, since it arises from this same conduct, one, I

19 will say that I spoke -- or my office spoke with the case

20 manager this morning from that court, and we were told that

21 that may be dismissed.

22             Now, obviously, that's just the case manager, so

23 we don't know what's going to happen.  The case is pending as

24 the pretrial report shows.

25             THE COURT:  Okay.

1          MS. ZACK:  I'm --

2          THE COURT:  Ms. Zack?

3          MS. ZACK:  -- going to object, Your Honor.

4          You should not take into consideration what the

5     State is going to do at any level, as part of your

6     determination as to whether or not they meet the requirements

7     and -- in Your Honor's calculation as to whether they should

8     be detained.  So, I'd ask that you disregard that statement.

9          MR. GALLAHGER:  Well, if the Government's position is

10    that the Court -- the Court should not take into effect the

11    state case, I'm all for that, so I will agree with that.

12          So, that you can put aside.

13          His criminal history -- this is -- this -- the -

14    - the things that would be a worry -- worrying to the Court

15    are old.  The things that happened -- the last felony

16    conviction that we are sure is a felony conviction appears to

17    have been in 1984.  It's not clear the -- it's not clear as to

18    the -- the witness about the more recent convictions, and she

19    wasn't sure.  But even those, the most -- the longest on

20    timing is certainly passed.  The evidence of any time in jail

21    in the past seven years -- in fact, there doesn't appear to

22    have been a charge against him in that time, unless sentence

23    for him was of seven months of confinement, which he appears

24    to have served out.

25          But he is someone with long standing ties to the

1  community.  He has connections to his family as both the

2  pretrial report and their cousin's support demonstrate.  He's

3  -- there is -- the ties to Africa are minimal.  That's crazy,

4  Your Honor.  There is an email contact.  There's no evidence

5  that he has either the means -- or the legal means or

6  financial means to travel outside the country and certainly

7  such a far place as that nor that he's made any attempt to do

8  so in the past over this relationship that's apparently gone

9  on via email.

10            And moreover, the facts and circumstances of

11  this offense do not show -- they show that this was -- the

12  inference that this was engaged in for business purposes.

13  There's evidence of -- the Government testified about evidence

14  -- the witness testified about evidence of sale, not of some

15  kind of uncontrollable compulsion to engage in some sexual

16  acts.  This was, from the evidence, that the Government may

17  allege illegal, but nonetheless a business occupation, which

18  is something that can be easily controlled by conditions of

19  release set by this Court.

20            There's no danger posed to the community by him,

21  certainly that cannot be addressed by this Court's conditions.

22  I mean, he's of no risk of flight at all, because he has no

23  place to go to.

24            So, I'd urge the Court to set conditions, put

25  forth a surety, if need be, and require him to provide

1 verification of employment, residence, those things that are a

2 concern to the Government and obviously the Court, but the

3 Court had easily set the bail in this court that is

4 appropriate in this case, Your Honor.

5       THE COURT:  Okay.

6           Now, I understand, assuming that this isn't

7 technically -- assuming for sake of argument that it isn't a

8 crime of violence, are you disputing or challenging the fact

9 that the acts portrayed are violent in nature?

10       MR. GALLAGHER:  I'm making a statutory argument, Your

11 Honor.

12       THE COURT:  Okay.

13       MR. GALLAGHER:  The statute defines a crime of

14 violence in a particular way, and the Fifth Circuit has oodles

15 of case law on this in different contexts, and it --

16       THE COURT:  Okay.

17       MR. GALLAGHER:  -- has a precise definition.  So it

18 is not just like someone's engaging in violent conduct.

19           I don't -- I am not -- I haven't had any reason

20 to dispute the evidence set forth about the nature of these

21 videos --

22       THE COURT:  Okay.

23       MR. GALLAGHER:  -- but the statute which the Court is

24 required to consider requires the Court to consider when

25 something meets the statutory definition of crime of violence,

1   which as the Government indicated set force at -- set forth at

2   3156(a)(4).

3          THE COURT:  Okay.

4          MR. GALLAGHER:  It simply doesn't.  It's a precise

5   definition and that the evidence provided does not show that

6   the conduct meets that definition.

7          THE COURT:  Okay.

8              Ms. Raynor?

9          MS. RAYNOR:  Your Honor, the presumption of innocence

10  I believe it still stands.  Ms. Richards has been charged in

11  the state courts based on facts stemming from this same case.

12             Speaking of discrepancies, even in the State's

13  Indictment versus the Indictment brought here by the

14  Government, their dates of when these incidents occurred are

15  not on point.  One says, 2010.  One says, 2011.

16         MS. ZACK:  Objection, Your Honor.

17         THE COURT:  Okay.

18         MS. RAYNOR:  And the -- and the reason why --

19         THE COURT:  Well, I'm just wanting -- I don't want it

20  to interrupt you, but basically I'm not going to consider the

21  state charges, so -- I mean, we have federal charges, federal

22  elements.  That's what I'm concerned with, so -- I don't mean

23  to interrupt you, but the fact that there are discrepancies,

24  the fact that there are state charges, I'm not going to

25  consider.

1          MS. RAYNOR:  Okay.  I was just leading into the

2   discrepancies --

3          THE COURT:  Okay.

4          MS. RAYNOR:  -- she said about them being boyfriend

5   and girlfriend, but --

6          THE COURT:  Okay.

7          MS. RAYNOR:  Okay.

8          THE COURT:  I just wanted to say that I'm not going

9   to be considering that so --

10          MS. RAYNOR:  But even in this case alone, Your Honor

11   --

12          THE COURT:  Okay.

13          MS. RAYNOR:  -- the acts that were alleged to have

14   occurred in 2010, 2011 in the Indictment, that would put Ms.

15   Richards at eighteen, nineteen years of age when these acts

16   occurred.

17          Ms. Richards -- during that time I do believe

18   that the courts had ruled that the law, 18 USC 48, were

19   unconstitutional, the law was unconstitutional in *U.S. v.*

20   *Stevens.*

21          During the time that some of these acts were

22   alleged, *United States v. Stevens* ruled that -- the Supreme

23   Court ruled that these acts -- the act itself, the law itself,

24   was unconstitutional in this State, so it matters when these

25   acts occurred.

DIGITAL SCROLL TRANSCRIPTION                    281.996.7978

1          THE COURT:  Okay.

2              So --

3          MS. RAYNOR:  It is -- is -- it is -- I'm sorry.

4          THE COURT:  So, I'm sorry.

5              So, you're saying that the acts charged in the

6     Indictment were not -- the law was unconstitutional at the

7     time the acts were charged in this Indictment?

8          MS. RAYNOR:  That's correct.

9          THE COURT:  Okay.

10         MS. RAYNOR:  And if that is the case, then the

11    likelihood of conviction, at least on some of those acts that

12    are alleged in the federal Indictment, are very, very

13    unlikely.

14         THE COURT:  Okay.

15         MS. RAYNOR:  Ms. Richards is now twenty-two years

16    old.  She just turned twenty-two last month, and she does have

17    some employment.  She does babysit.  She does do hair.  She's

18    indicated that to pretrial.  And she does do the massages.

19             As unsavory as, you know, her employment may

20    seem to be, if she does full body massages or whatnot, it is

21    not illegal.  It's still gainfully employment.  And if she's

22    filing her tax returns, as she's indicated she has to me, then

23    she has some form of employment and some ties to the community

24    with respect -- she's never been anywhere other than Waco

25    where she was born and Houston, Texas.

1           THE COURT:  Okay.

2           MS. RAYNOR:  And she has family members here who

3   would actually sign off on any bond that the Court would give

4   to her.

5           THE COURT:  Okay.

6           MS. RAYNOR:  She has and owns -- owns no passport,

7   and we would ask that the Court take into consideration that

8   she's only been charged with the resisting arrest and the

9   assault out of Waco --

10          THE COURT:  Okay.

11          MS. RAYNOR:  -- and that there has been no other

12  conviction other than a Class B misdemeanor of criminal

13  trespass in her history.

14          THE COURT:  Okay.

15          MS. RAYNOR:  I'd like the Court to take all those

16  things into consideration and at least consider that prior to

17  making a determination whether she should be released or not.

18          THE COURT:  Okay.

19              Thanks, Ms. Raynor.

20          MS. ZACK:  Your Honor, can I --

21          THE COURT:  Ms. Zack?

22          MS. ZACK:  -- briefly respond?

23          THE COURT:  Yes.

24          MS. ZACK:  As to Mr. Gallagher's legal argument, I

25  would proffer and we can put the officer back on the stand

 1 that individuals that the officer contacted and through their

 2 investigation they determined that people supplied animals to

 3 Ms. Richards to kill in these videos.  They were not her

 4 property, necessarily.

 5          THE COURT:  Okay.

 6          MS. ZACK:  They were other people's property.

 7          THE COURT:  Can you call the officer back --

 8          MS. ZACK:  Absolutely.

 9          THE COURT:  -- so I can get that testimony on -- on

10 the stand?

11          But -- I didn't want to interrupt you, but that

12 -- I'd like to have that evidence on the record.

13          MS. ZACK:  Absolutely.

14          THE COURT:  I'm sorry, Officer.

15          One more time.

16   OFFICER SUSANNE HOLLIFIELD, GOVERNMENT'S WITNESS RECALLED,

17                      PREVIOUSLY SWORN

18                      DIRECT EXAMINATION

19 BY MS. ZACK:

20 Q  Officer, when we're discussing the source of some of the

21 animals in the videos, it's my understanding that there's

22 evidence to suggest that individuals supplied Ms. Richards

23 with animals to kill.  Is that correct?

24 A  That's correct.

25 Q  Can you explain that to the Court how you came to find out

1   that she was supplied with those animals?

2   A  Ms. Richards supplied that information during one of our

3   interviews that was -- that -- that was conducted after -- on

4   August the 15th.

5   Q  And are there any emails or any other suggestions of

6   individuals bringing animals to her either at these locations

7   or others to be killed?

8   A  Yes.

9   Q  And can you explain that to the Court?

10  A  Yes.

11              During one of the interviews Ms. Richards told

12  me that an individual from Austin, Texas brought her a dog.

13  So, she did -- she told me that she got her animals from

14  various methods.

15  Q  Have you been able to determine that sales were made to

16  individuals in the Austin, Texas area?

17  A  Yes.

18  Q  How do you know that?

19  A  We interviewed a purchaser of the videos in Austin, and he

20  told us that he purchased many videos from this -- from Ms.

21  Richards.

22          MS. ZACK:  No further questions.

23          THE COURT:  Cross examination, Mr. Gallagher?

24          MR. GALLAGHER:  Thank you.

25                      CROSS EXAMINATION

1  BY MR. GALLAGHER:

2  Q  Okay.  So, just so I understand, you said that there's some

3  testimony that other people gave her the animals pictured in

4  the videos, right -- or provided her the animals --

5  A  Ms. Richards told me that other people provided her

6  animals.

7  Q  All right.  For the purpose of her videoing her slaughter

8  of them, right?

9  A  Correct.

10 Q  Okay.

11          So, there's no evidence they're taking animals

12 from someone who didn't want them to be taken, right?

13 A  She also told me that she got some of the animals from off

14 the streets, so I don't know if they were -- you know, I don't

15 know if they were just got -- people's pets who got out.  I

16 don't know.  She just -- you know --

17 Q  Okay.

18          So, do you have any evidence that any animal

19 depicted in any of the videos belonged to another and the

20 other did not wish the conduct depicted to happen?

21 A  No.

22          MS. GALLAGHER:  Nothing further, Your Honor.

23          THE COURT:  Okay.

24          MS. RAYNOR:  Nothing further from me either.

25          THE COURT:  Okay.

1              Anything further?

2                    REDIRECT EXAMINATION

3   MS. ZACK:

4   Q  Do any of the animals appear to be malnourished or strays

5   in -- based on your experience as an animal cruelty

6   investigator?

7   A  No.

8   Q  And did they all appear healthy and well cared for?

9   A  Yes.

10  Q  Did any of them shy away from human contact other than acts

11  of cruelty?

12  A  No.

13           THE COURT:  Okay.

14              Anything further from this witness?

15           MS. RAYNOR:  Nothing further.

16           THE COURT:  Okay.

17           MR. GALLAGHER:  Just a second.  I'm sorry.

18           THE COURT:  Sure.

19                    RECROSS EXAMINATION

20  BY MR. GALLAGHER:

21  Q  Did any of the people -- I'm sorry.

22              You said you learned of this from Ms. Richards,

23  right?  You learned of her getting the animals from Ms.

24  Richards?

25  A  Yes, sir.

1 Q  Did you -- let me get a little more clear.

2            Did you speak to any of the people who provided

3 animals?

4 A  No.

5 Q  Okay.  You said you reviewed some animals -- I mean -- I'm

6 sorry.

7            You reviewed some emails in which this is

8 discussed?

9 A  No.  We interviewed a purchaser, who -- we interviewed an

10 individual who purchased the videos.

11 Q  Okay.

12 A  And he told us that -- I'm sorry.

13            Yes.  You're right.

14            Ashley told me that an individual from Austin

15 brought her a dog.  Is that what you're asking me?

16 Q  Yes.

17 A  Yes, sir.

18 Q  Okay.

19            And so, did you interview the person in Austin?

20 A  Yes.

21 Q  Okay.

22            And what did he tell you about the dog?

23 A  He didn't mention the dog.  He just mentioned -- he

24 mentioned other animals.

25 Q  But this was someone who willingly purchased crush videos,

1  right?

2  A   Correct.

3  Q   Okay.

4              Did he complain to you about her taking

5  something of his and not giving it back?

6  A   No.

7          MR. GALLAGHER:  Nothing further, Your Honor.

8          THE COURT:  Okay.

9              Anything further?

10         MS. ZACK:  No further questions for this witness.

11         THE COURT:  Okay.

12             Thank you, officer.

13         MS. ZACK:  And the only other response I have, Your

14 Honor, is to the argument that the statute was declared

15 unconstitutional.

16             There are only two counts in the Indictment that

17 have any dates that potentially could fall when the statute

18 was unconstitutional, but is a date range that post-dates as

19 well the amendment to the statute.  So, there are no counts in

20 the Indictment that solely encompass the pre-amended statute

21 that was declared unconstitutional in *Stevens*.

22         THE COURT:  Okay.

23             Okay, counsel.

24             I'm going to take a --

25         MR. GALLAGHER:  You --

1           THE COURT:  -- brief recess -- I'm sorry?

2           MR. GALLAGHER:  May I just -- on that crime of

3    violence point, Your Honor, just based on her evidence may I

4    just make one discrete point?

5           THE COURT:  Sure.

6           MR. GALLAGHER:  I still per- -- I persist in the

7    notion that this falls outside the definition of the crime of

8    violence.  The evidences we just heard is that animals were

9    provided to her, and there's no evidence that she did anything

10   to them that was not authorized or expected by the people who

11   provided them.

12          THE COURT:  Okay.

13          MR. GALLAGHER:  They expected these things be -- they

14   expected these animals to be destroyed.  They weren't

15   expecting property back.  This is a bailment.  This is giving

16   of a property to her to do something with.  There's no

17   evidence that she exceeded the expectations or property rights

18   of any other person, to the minimum I think is required to be

19   considered a crime of violence under the statutory definition.

20          THE COURT:  Anything further, Ms. Zack?  A point?

21          MS. ZACK:  No, Your Honor.

22          THE COURT:  Okay.

23             Counsel, I'm going to take a brief recess and

24   come back with my ruling.

25      (Recess taken at 12:22:48 p.m.)

1    (Proceedings resumed at 1:03:46 p.m.)

2         THE COURT:  Please be seated, everyone.

3              We're back on the record in the case of Ms.

4  Richards and Mr. Justice.

5              With respect to Ms. Richards, in accordance with

6  the Bail Reform Act 18 USC section 3142(f), the Court has held

7  the detention hearing in this matter, and I conclude that the

8  following facts are established by both a preponderance of the

9  evidence or a clear and convincing evidence and require the

10  detention of Ms. Richards pending the trial in this matter.

11              The Court finds that there's a serious risk that

12  Ms. Richards would flee the jurisdiction, if I would release

13  her, and that there is a serious risk that she poses a danger

14  to the community.

15              I find that there's no condition or combination

16  of conditions set forth in 18 USC section 3142(c), which will

17  reasonably assure the appearance of the Defendant, as

18  required.

19              I also find that there's no condition or

20  combination of conditions set forth in 18 USC section 3142(c),

21  which would reasonably assure the safety of any other person

22  in the community.

23              I conclude that the following factors are

24  present under 21 USC Section 3142(g) and are to be taken into

25  account.  The Court received credible evidence that the

DIGITAL SCROLL TRANSCRIPTION                          281.996.7978

Defendant committed the acts charged in the Indictment and
these acts were of an extremely violent nature.

The Court found that there was credible evidence
that the Defendant has a prior criminal history, including a
conviction for violent conduct, specifically an assault.

The Court finds that the Court received evidence
that the Defendant does possess a weapon and other destructive
devices in her household and has a history of brandishing that
weapon -- that firearm in public.

The Court finds that there is -- that the
Defendant has no stable residence and no verifiable
employment.

The Court finds that the Defendant has
questionable mental status.

The Court finds that the Defendant does not have
significant financial ties to the community, and the Court
finds that there -- the Court received credible evidence that
the Defendant has a demonstrated history of extremely violent
behavior and failure to follow the law, including, as the
Court mentioned, a charge for assault.

The Court has considered whether or not she
could be released into the custody of her relatives.  Given
the factors outlined above, the Court finds that there are no
conditions that the Court could impose upon her that would
reasonably assure the safety of either the community or

1  reasonably assure her attendance at trial should she be

2  released.

3          So, for these reasons the Court is going to

4  order that she be held in custody until such time as trial.

5          Ms. Raynor?

6          MS. RAYNOR:  Just one thing, Your Honor.

7          You said that she had been convicted of a crime

8  of violence --

9          THE COURT:  Oh, I'm sorry.

10          She's been --

11          MS. RAYNOR:  Charged.

12          THE COURT: -- charged with a crime of violence, the

13  assault of the officer.

14          MS. RAYNOR:  Okay.

15          THE COURT:  Thank you.

16          MS. RAYNOR:  Thank you.

17          THE COURT:  So again, the Court -- she has a prior

18  criminal history, including a arrest for a violent crime,

19  specifically assault of a public officer.

20          So, for these reasons, the Court is going to

21  order that Ms. Richards remain in the custody of the U. S.

22  Marshal Service until such time as her trial.

23          And with respect to Mr. Justice, in accordance

24  with the Bail Reform Act 18 USC section 3142, the Court has

25  held the detention hearing in this matter.

1          I conclude that the following facts are

2    established by a preponderance of the evidence or clear and

3    convincing evidence and require the detention of Mr. Justice

4    pending the trial in this case.

5          The Court finds that there is a serious risk

6    that Mr. Justice would flee the jurisdiction if he were

7    released prior to trial and is a danger -- a serious risk that

8    he is a danger to the community.

9          I find that there's no condition or combination

10   of conditions set forth in 18 USC section 3142(c), which would

11   reasonably assure his appearance as required at trial should I

12   release him from trial -- release him from custody, and I also

13   find that there's no condition or combination of conditions

14   set forth in 18 USC section 3142(c), which would reasonably

15   assure the safety of any other person or the community should

16   I release him from custody.

17          I conclude that the following facts are present

18   under 21 USC section 3142 and are to be taken into account.

19          The Court finds that there's credible evidence

20   that the Defendant committed the acts charged in the

21   Indictment, and those acts are of an extremely violent nature.

22          The Court finds that there's credible evidence

23   that the Defendant has a prior criminal history, including a -

24   - including convictions for violent conduct, specifically

25   assault on a family member and aggravated assault on a peace

1  officer.

2              The Court finds that there's evidence that the

3  Defendant does not have a stable residence and not -- and does

4  not have verifiable employment.

5              The Court finds that the Defendant does not have

6  significant financial ties to the community.

7              The Court also finds that this Defendant has a

8  questionable mental health status.

9              The Court also finds that there is evidence that

10  his prior criminal history includes charges of failure to

11  comply with court orders after being released on probation,

12  and the Court finds that it received -- that there is credible

13  evidence that the Defendant has a demonstrated history of

14  extremely violent behavior and a failure to follow the law --

15  follow the law, including assault.

16              The Court has considered whether or not he could

17  be released to the custody of his relatives, but specifically

18  in light of his prior charges for assault on a family member

19  and assault on a peace officer and the charges alleged in this

20  case, the Court finds that such conditions would not be

21  appropriate to assure either the safety of the community or

22  that he would appear at trial should he be released.

23              So, I'm also ordering that Mr. Justice be held

24  in custody by the Marshal Service pending the trial in this

25  matter.

1          Mr. Gallagher, do you have anything?

2          MR. GALLAGHER:  No, Your Honor.

3          THE COURT:  Okay.

4               Okay.  Ms. Zack -- oh.

5          MR. STABE:  I'm Bob Stabe, Your Honor.  She had a

6  doctor's appointment, Your Honor --

7          THE COURT:  Okay.

8          MR. STABE:  -- but that's all for the Government,

9  Your Honor.

10         THE COURT:  Anything further from the Government?

11              Is there anything other -- for the -- we need to

12  take up in this case this afternoon?

13         MR. STABE:  I don't believe so, Your Honor.

14         THE COURT:  Okay.

15         MR. GALLAGHER:  There's none for Mr. Justice.

16         MS. RAYNOR:  Nothing further for Ms. Richards either.

17         THE COURT:  Okay.

18              Mr. Justice, Ms. Richards, good luck to you

19  both, and, counsel, you may be excused.  And Officer, you may

20  be excused as well.

21     (Proceedings concluded at 1:12 p.m.)

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                     HOUSTON DIVISION

4

5        I, Linda Griffin, court approved transcriber, certify that

6    the foregoing is a correct transcript from the official

7    electronic sound recording of the proceedings in the above-

8    entitled matter.

9

10   /s/ Linda Griffin                        February 8, 2013
     Linda Griffin                                Date
11   Digital Scroll Transcription

12

13

14

15

16

17

18

19

20

21

22

23

24

25