IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA,          §
                                   §
                Plaintiff,         §
                                   §
v.                                 §          CRIMINAL NO. H-12-731
                                   §
ASHLEY NICOLE RICHARDS and         §
BRENT JUSTICE,                     §
                                   §
                Defendants.        §

## MEMORANDUM OPINION AND ORDER

Defendants Ashley Nicole Richards and Brent Justice (collectively, "Defendants") were indicted on five counts of violating the federal "animal crush video" statute, 18 U.S.C. § 48 (effective Dec. 9, 2010).  Pending before the court are Brent Justice's Motion to Dismiss (Docket Entry No. 29) and Ashley Nicole Richards' Motion to Dismiss (Docket Entry No. 30).  Defendants contend that § 48 abridges the freedom of speech protected by the First Amendment to the United States Constitution.  For the reasons explained further below, the court agrees.  The court will therefore grant Defendants' motions to dismiss.

## I.   Background

### A.   *United States v. Stevens* and the Amended 18 U.S.C. § 48

Section 48 of Title 18, United States Code, was signed into law on December 9, 2010, in response to the Supreme Court's decision earlier that year in United States v. Stevens, 130 S. Ct.

1577 (2010).   In <u>Stevens</u> the Court considered a challenge to the
prior version of § 48, titled "Depiction of animal cruelty," which
prohibited the creation or distribution of any "depiction of animal
cruelty."   Section 48(c)(1) (effective December 9, 1999, to
December 8, 2010) defined a "depiction of animal cruelty" as one

> in which a living animal is intentionally maimed,
> mutilated, tortured, wounded, or killed, if such conduct
> is illegal under Federal law or the law of the State in
> which the creation, sale, or possession takes place,
> regardless of whether the maiming, mutilation, torture,
> wounding, or killing took place in the State.

In <u>Stevens</u> the Court declined to carve out a new category of
"unprotected" speech for "depictions of animal cruelty." <u>Stevens</u>,
130 S. Ct. at 1586 (2010) ("Maybe there are some categories of
speech that have been historically unprotected, but have not yet
been specifically identified or discussed as such in our case law.
But if so, there is no evidence that 'depictions of animal cruelty'
is among them.").  Next, reading the statute "to create a criminal
prohibition of alarming breadth," <u>id.</u> At 1588, the Court held that
the ban on depictions of animal cruelty was substantially overbroad
and therefore unconstitutional under the First Amendment.  <u>Id.</u> at
1592.  The reach of the statute was "not restricted to depictions
of conduct that violates a law specifically directed at animal
cruelty."  <u>Id.</u> at 1588 n.4.  The statute therefore conceivably
prohibited a wide range of expression that would not qualify as
"animal cruelty" including, for example, a depiction of "the humane
slaughter of a stolen cow." <u>Id.</u> at 1588.  The Court left open the
question of "whether a statute limited to crush videos or other

depictions of extreme animal cruelty would be constitutional." Id. at 1592.

The current § 48, titled "Animal crush videos," defines an "animal crush video" as "any photograph, motion-picture film, video or digital recording, or electronic image" that:

> (1) depicts actual conduct in which 1 or more living non-human mammals, birds, reptiles, or amphibians is intentionally crushed, burned, drowned, suffocated, impaled, or otherwise subjected to serious bodily injury (as defined in section 1365 and including conduct that, if committed against a person and in the special maritime and territorial jurisdiction of the United States, would violate section 2241 or 2242); and

> (2) is obscene.

Section 48(a)(1)-(2). The statute establishes a criminal penalty for any person who knowingly creates or distributes an animal crush video by means of interstate commerce. Section 48(b)(1)-(2). Specifically exempted from the statutory prohibitions is any visual depiction of "customary and normal veterinary or agricultural husbandry practices," "the slaughter of animals for food," or "hunting, trapping, or fishing." Section 48(e)(1). Also exempted is any "good-faith distribution" of an otherwise prohibited video to a law enforcement agency or to a third party to determine if referral to a law enforcement agency is appropriate. Section 48(e)(2).

Defendants are charged with five counts of violating § 48 between February of 2010 and August of 2012. In Counts One through Four of the Indictment Defendants are charged with creating animal

crush videos in violation of § 48(b)(1).[1]  In Count Five Defendants are charged with distributing animal crush videos in violation of § 48(b)(2).[2]

## B.  Motions to Dismiss

Justice filed his Motion to Dismiss Counts One through Five in the Indictment on January 22, 2013, arguing that § 48 violates the First Amendment.[3]  On January 30, 2013, Richards filed her Motion to Dismiss Counts One through Five, "adopt[ing], join[ing] in and incorporat[ing] by reference" Justice's Motion to Dismiss.[4] Defendants contend that § 48 is an impermissible content-based regulation of speech and is therefore facially unconstitutional.[5]

Defendants acknowledge that certain speech classified as "obscenity" falls outside the protections of the First Amendment. Defendants argue, however, that § 48 does not regulate such unprotected speech -- notwithstanding the requirement in

_____

[1]Criminal Indictment ("Indictment"), Docket Entry No. 1, pp. 2-3.

[2]Id. at 3-4.  Counts Six and Seven allege that Defendants violated two federal obscenity statutes, 18 U.S.C. §§ 1465 and 1466.  Id. at 4-5.  Neither count is at issue here.

[3]Motion to Dismiss ("Justice's Motion to Dismiss"), Docket Entry No. 29.

[4]Motion to Dismiss ("Richards' Motion to Dismiss"), Docket Entry No. 30, p. 1.

[5]Justice's Motion to Dismiss, Docket Entry No. 29, p. 5; Richards' Motion to Dismiss, Docket Entry No. 30, p. 5.

-4-

subsection (a)(2) that the prohibited material be "obscene."[6] Defendants argue that as a matter of law animal crush videos are not "obscene," because that term only applies to depictions of "sexual conduct."[7] Since animal crush videos do not depict "sexual conduct," Defendants argue that Congress has unconstitutionally attempted to expand the definition of obscenity.[8] Defendants therefore argue that animal crush videos, as defined by § 48, constitute protected speech.[9] Defendants argue that as a content-based regulation of protected speech § 48 cannot withstand strict scrutiny.[10]

The United States filed a consolidated response to the motions to dismiss on February 15, 2013, contending that "Congress' definition of animal crush videos effectively removed the content of these expressions from the ambit of First Amendment protection."[11] The United States argues that the speech proscribed

---

[6]Justice's Motion to Dismiss, Docket Entry No. 29, pp. 8-10; Richards' Motion to Dismiss, Docket Entry No. 30, p. 5.

[7]Justice's Motion to Dismiss, Docket Entry No. 29, p. 9; Richards' Motion to Dismiss, Docket Entry No. 30, p. 5.

[8]Id.

[9]Justice's Motion to Dismiss, Docket Entry No. 29, pp. 8-10; Richards' Motion to Dismiss, Docket Entry No. 30, p. 5.

[10]Justice's Motion to Dismiss, Docket Entry No. 29, p. 11; Richards' Motion to Dismiss, Docket Entry No. 30, p. 5.

[11]Government's Consolidated Response to Motions to Dismiss Indictment ("United States' Response"), Docket Entry No. 36, p. 31.

by § 48 falls within the "traditional, well-established definitions of obscenity" and is therefore unprotected by the First Amendment.[12] The United States also argues that the statute only prohibits "speech integral to criminal conduct," a category of speech that is not protected by the First Amendment.[13] Even if § 48 does regulate protected speech, the United States argues that the statute satisfies strict scrutiny.[14] Defendants filed separate replies to the United States' Response.[15]

## II.  First Amendment Principles

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech."  All methods of expressing ideas, including movies, art, books, and expressive physical conduct, are safeguarded by the free speech clause. See, e.g., Texas v. Johnson, 109 S. Ct. 2533, 2540 (1989) (holding that burning the American flag is expressive conduct that implicates the First Amendment); Joseph Burstyn, Inc. v. Wilson, 72 S. Ct. 777, 781 (1952) (holding that "expression by means of motion pictures" is of First Amendment concern).  Accordingly, as a general matter,

---

[12]Id. at 29.

[13]Id. at 27.

[14]Id. at 31-32.

[15]Reply in Support of Motion to Dismiss ("Justice's Reply"), Docket Entry No. 37; Reply to the Government's Response to Richards' Motion to Dismiss ("Richards' Reply"), Docket Entry No. 38.

the government may not "restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. Am. Civil Liberties Union, 122 S. Ct. 1700, 1707 (2002) (internal quotation marks omitted).   A law imposing a content-based restriction on expression is therefore invalid unless the government can demonstrate that the law satisfies strict scrutiny -- i.e., the law is justified by a compelling government interest and is narrowly tailored to serve that interest.   Brown v. Entertainment Merchants Ass'n, 131 S. Ct. 2729, 2738 (2011); see also United States v. Playboy Entm't Group, Inc., 120 S. Ct. 1878, 1886 (2000) ("As we consider a content-based regulation, the answer should be clear:   The standard is strict scrutiny."); R.A.V. v. City of St. Paul, 112 S. Ct. 2538, 2542 (1992) ("Content-based regulations are presumptively invalid.").   Content-based regulations that cannot survive strict scrutiny are facially unconstitutional under the First Amendment. See, e.g., Brown, 131 S. Ct. 2729; R.A.V., 112 S. Ct. 2538.

There exist however certain "well-defined and narrowly limited" areas of expression in which the government may impose content-based restrictions immune from strict scrutiny review because the "freedom of speech" guaranteed by the First Amendment excludes such types of expression. See Sable Commc'ns of Calif., Inc. v. F.C.C., 109 S. Ct. 2829, 2835 (1989).   Among the excluded categories are incitement, see, e.g., Brandenburg v. Ohio, 89 S. Ct. 1827 (1969); defamation, see, e.g., N.Y. Times Co. v.

Sullivan, 84 S. Ct. 710 (1964); fighting words, see, e.g.,
Chaplinsky, 62 S. Ct. 766; obscenity, see, e.g., Miller v.
California, 93 S. Ct. 2607 (1973); and speech integral to criminal
conduct, see, e.g., Giboney v. Empire Storage & Ice, Co., 69 S. Ct.
684 (1949).  The Supreme Court has stated that these types of
expression are "no essential part of any exposition of ideas, and
are of such slight social value as a step to truth that any benefit
that may be derived from them is clearly outweighed by the social
interest in order and morality." Chaplinsky v. New Hampshire, 62
S. Ct. 766, 769 (1942) (quoted in Stevens, 130 S. Ct. at 1585;
R.A.V., 112 S. Ct. at 2543).  Content-based laws that restrict or
ban these sorts of "unprotected" speech are generally valid.  See
Brown, 131 S. Ct. at 2735 (citing Ginsberg v. New York, 88 S. Ct.
1274, 1281 (1968) (to uphold a law restricting "obscene" material,
Court was required only to find that the legislature's judgment was
not "irrational")).

### III.  Analysis

The United States invokes two categorical exclusions in this
case:  obscenity and speech integral to criminal conduct.  If the
expression regulated by § 48 falls within either exclusion, the
statute is valid and the motions to dismiss should be denied.  If
not, the statute is a content-based regulation of constitutionally
protected speech, and the United States must demonstrate that the
law is narrowly tailored to serve a compelling government interest.

-8-

## A.   Obscenity

### 1.   The *Miller* Test

The Supreme Court first developed the standards used to identify "obscene" -- and therefore unprotected -- speech in <u>Miller v. California</u>, 93 S. Ct. 2607 (1973).  As an initial matter the Court held that the prohibited material "must be specifically defined" by the applicable law, "as written or authoritatively construed."  <u>Id.</u> at 2615.  The Court then established the test that continues to control obscenity cases:  To qualify as a regulation of obscene speech, a prohibition must be limited to works that (1) "taken as a whole, appeal to the prurient interest in sex," (2) "portray sexual conduct in a patently offensive way," and (3) "taken as a whole, do not have serious literary, artistic, political, or scientific value."  <u>Id.</u>  In making these determinations contemporary community standards apply.  <u>Id.</u>  Examples of obscenity include representations or descriptions of "ultimate sexual acts" and "masturbation, excretory functions, and lewd exhibition of the genitals."  <u>Id.</u>

Consistent with the <u>Miller</u> test and its accompanying examples, the Supreme Court has made clear "that the obscenity exception to the First Amendment does not cover whatever a legislature finds shocking, but only depictions of 'sexual conduct.'"[16]  <u>Brown</u>, 131

---

[16]Even Justice Potter Stewart, who set forth the amorphous "I know it when I see it" standard, recognized that only "hard-core
(continued...)

S. Ct. at 2734 (citing <u>Miller</u>, 93 S. Ct. at 2614-15).  In <u>Brown</u> the

Court struck down a California statute that prohibited the sale or

rental to minors of "violent video games"

> in which the range of options available to a player
> includes killing, maiming, dismembering, or sexually
> assaulting an image of a human being, if those acts are
> depicted in a manner that a reasonable person,
> considering the game as a whole, would find appeals to a
> deviant or morbid interest of minors, that is patently
> offensive to prevailing standards in the community as to
> what is suitable for minors, and that causes the game, as
> a whole, to lack serious literary, artistic, political,
> or scientific value for minors.

<u>Id.</u> at 2732-33 (internal quotation marks and brackets omitted).

Despite tracking much of the language from the <u>Miller</u> definition

the California statute conspicuously lacked any requirement that

the targeted games depict "sexual conduct."   <u>Id.</u> at 2735.   The

Court held that "violence is not part of the obscenity that the

Constitution permits to be regulated."   <u>Id.</u>   The Court reasoned

that while a legislature may adjust the definition of obscenity --

for example, to ensure "that a definition designed for adults is

not uncritically applied to children," <u>see</u> <u>Ginsberg</u>, 88 S. Ct. at

1279 (upholding statute prohibiting sale to minors of sexual

material that would be obscene from the perspective of a minor) --

the legislature must do so only within the realm of regulating

displays of sexual conduct. <u>Brown</u>, 131 S. Ct. at 2735.

---

[16](...continued)
pornography" qualifies as "obscene" for purposes of the First
Amendment.   <u>Jacobellis v. Ohio</u>, 84 S. Ct. 1676, 1683 (1964)
(Stewart, J., concurring).

2.   The Obscenity Exclusion Does Not Apply

Section 48 defines an animal crush video as one that
(1) depicts an enumerated act of violence against an animal and
(2) is obscene.   Section 48(a)(1)-(2).   The term "obscene" is not
defined in § 48, and no court has interpreted the statute.   In the
Findings section of the Animal Crush Video Prohibition Act of 2010
Congress declared:   "In the judgment of Congress, many animal crush
videos are obscene in the sense that the depictions, taken as a
whole -- (A) appeal to the prurient interest in sex; (B) are
patently offensive; and (C) lack serious literary, artistic,
political or scientific value."   Pub. L. 111-294, 124 Stat. 3177,
§ 2(6)(A)-(C).   The House Report summarized expert testimony
regarding legislation to ban animal crush videos:   "The witnesses
concurred that Congress can ban interstate and foreign commerce in
depictions of acts of illegal animal cruelty that appeal to the
'prurient interest,' are 'patently offensive,' and 'lack serious
literary, artistic, political or scientific value.'"   H.R. REP.
No. 111-549, p. 5 (2010).   Accordingly, the House Report stated
that to fall within the prohibition of § 48 a depiction must
"appeal to the prurient interest, and be patently offensive when
taken as a whole and applying contemporary community standards.   It
must also, when taken as a whole, lack serious literary, artistic,
political, or scientific value."   Id. at 10.   The House Report
concluded that amended § 48 "is written so as to ensure that only
a narrow category of obscene speech is affected."   Id.   The

-11-

Findings section of the Animal Crush Video Prohibition Act of 2010 and the accompanying House Report demonstrate that Congress defined a depiction of an act of violence against an animal as "obscene" if the depiction (1) appeals to the prurient interest in sex; (2) is patently offensive; and (3) lacks serious literary, artistic, political or scientific value.

Congress, like the California legislature in <u>Brown</u>, has attempted to create its own definition of "obscenity." While this definition tracks much of the language from the <u>Miller</u> definition, there is no mention of "sexual conduct." The second prong of the <u>Miller</u> test requires that the depiction "portray sexual conduct in a patently offensive way," not that something in that depiction simply be "patently offensive." The acts depicted in animal crush videos may be "patently offensive" under community standards. But under no set of community standards does violence toward animals constitute "sexual conduct."

Animal crush videos may contain women "making sexual noises" while causing injury and death to the animals. <u>See</u> H.R. REP. No. 111-549, pp. 5-6; <u>see also</u> <u>Stevens</u>, 130 S. Ct. at 1583 (noting that animal crush videos sometimes depict women 'talking to the animals in a kind of dominatrix patter' over '[t]he cries and squeals of the animals'" (quoting H.R. REP. No. 106-397, p. 2 (1999))). Yet, no reasonable formulation of the term "sexual conduct" can include making sexual noises while committing a

-12-

violent, non-sexual act.  Furthermore, the fact that a depiction
may be sexually arousing to its viewer, see Pub. L. 111-294, 124
Stat. 3177, § 2(4); H.R. REP. No. 111-549, p. 5, is relevant only
to the first prong of the Miller test (i.e., the depiction appeals
to the prurient interest), not the second.  The judgments of
Congress do not bring the speech banned by § 48 within Miller's
definition of obscenity.

The United States argues that Congress has merely "adjust[ed]
the boundaries" of the obscenity exclusion.[17]  But redefining the
exclusion to omit the "sexual conduct" requirement is more than a
boundary adjustment.  The Supreme Court unequivocally reaffirmed in
Brown that the obscenity exclusion does not stretch beyond the
sexual conduct first identified in Miller.  Brown, 131 S. Ct. at
2735.  Animal crush videos may be obscene in the vernacular sense
of the word, see, e.g., Stevens, 130 S. Ct. at 1598 (Alito, J.,
dissenting) (reproducing a description of an animal crush video),
but as established by Miller and its progeny the word "obscene" has
a specific meaning when used in the context of the First Amendment.
Animal crush videos depict violence, not sex organs or graphic sex
acts, and Congress may not "shoehorn speech about violence into
obscenity."  See Brown, 131 S. Ct. at 2734-35.  To expand that
which is unprotected by the First Amendment is to shrink that which
is protected.  The court therefore rejects the United States'

---

[17]United States' Response, Docket Entry No. 36, p. 29.

argument that the speech proscribed by § 48 falls within the
"traditional, well-established definitions of obscenity."[18]

## B.   Speech Integral to Criminal Conduct

### 1.   *Ferber* and the "Dry-up-the-Market" Rationale

Although the United States' primary defense of the statute
relies on the obscenity exclusion, the United States also argues
that the animal crush videos proscribed by § 48 constitute "speech
integral to criminal conduct."[19]   The Supreme Court has long held
that expression constituting a violation of a valid, non-speech-
related law is not protected by the First Amendment.  See, e.g.,
Giboney, 69 S. Ct. at 688 (refusing to extend First Amendment
protection to expressive picketing activities that constituted a
violation of a valid state antitrade restraint law).   The speech
integral to criminal conduct exclusion may also justify a
government's efforts to "dry up the market" for criminal activity
by suppressing certain speech.

The "dry-up-the-market" rationale was first applied in
New York v. Ferber, 102 S. Ct. 3348 (1982).   In Ferber the Court
upheld a New York law that proscribed the dissemination of material
depicting children under the age of 16 engaged in non-obscene
sexual conduct, see id. at 3352, holding that such expression was

---

[18]Id.

[19]Id. at 27.

categorically unprotected by the First Amendment.  <u>Id.</u> at 3358.
The Court noted that the protection of children from sexual
exploitation "constitutes a government objective of surpassing
importance," <u>id.</u> at 3355, while the value of permitting the
depictions was "exceedingly modest, if not <i>de minimis</i>."  <u>Id.</u> at
3357.

But the <u>Ferber</u> "decision did not rest on this 'balance of
competing interests' alone." <u>Stevens</u>, 130 S. Ct. at 1586 (quoting
<u>Ferber</u>, 102 S. Ct. at 3358).  "<u>Ferber</u> presented a special case:
The market for child pornography was 'intrinsically related' to the
underlying abuse, and was therefore 'an integral part of the
production of such materials, an activity illegal throughout the
Nation.'" <u>Stevens</u>, 130 S. Ct. at 1586 (quoting <u>Ferber</u>, 102 S. Ct.
at 3355, 3357).  The market was "intrinsically related" to child
abuse in part because each depiction operated as a "permanent
record" of the sexual abuse, the circulation of which exacerbated
the harm originally inflicted upon the child.  <u>Ferber</u>, 102 S. Ct.
at 3355.  Moreover, the demand for these materials was the driving
force behind their illegal production.  <u>Ferber</u>, 102 S. Ct. at 3355-
56.  The <u>Ferber</u> Court therefore upheld New York's efforts to "dry
up the market":

> [T]he distribution network for child pornography must be
> closed if the production of material which requires the
> sexual exploitation of children is to be effectively
> controlled. . . .  The most expeditious if not the only
> practical method of law enforcement may be to dry up the
> market for this material by imposing severe criminal

penalties on persons selling, advertising, or otherwise promoting the product.

Id. at 3355-56.   Ferber is thus grounded in the "previously recognized, long-established" categorical exclusion for speech integral to criminal conduct.   See Stevens, 130 S. Ct. at 1586; see also Ashcroft v. Free Speech Coalition, 122 S. Ct. 1389, 1401 (2002) ("[T]he speech [in Ferber] had what the Court in effect held was a proximate link to the crime from which it came."); Osborne v. Ohio, 110 S. Ct. 1691, 1696 (1990).

This subcategory of the speech integral to criminal conduct exclusion has been invoked sparingly.   The Supreme Court has approved of the "dry-up-the-market" rationale only where child pornography is involved.   For example, in Osborne the Court upheld an Ohio ban on the possession of child pornography, reaffirming that the government's interest in preventing the use of children as subjects in pornography is "'compelling'" "'beyond the need for elaboration,'" id. at 1696 (quoting Ferber, 102 S. Ct. at 3354 (internal quotation marks omitted)), and that the value of permitting child pornography is "'exceedingly modest, if not de minimis.'"   Osborne, 110 S. Ct. at 1695 (quoting Ferber, 102 S. Ct. at 3357).   The Court further recognized that the "materials produced by child pornographers permanently record the victim's abuse."   Osborne, 110 S. Ct. at 1697 (citing Ferber, 102 S. Ct. at 3355).   Accepting the "dry-up-the-market" rationale, the Court concluded that it was "surely reasonable for the State to conclude

that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand." Osborne, 110 S. Ct. at 1696.

In Ashcroft v. Free Speech Coalition, 122 S. Ct. 1389, this rationale was not extended to a federal ban on "virtual child pornography." The "virtual child pornography" at issue recorded no crime and created no victims; it therefore was not "intrinsically related" to the sexual abuse of children, or any other criminal activity. Id. at 1402. The Court rejected the government's argument that the virtual images could "lead to actual instances of child abuse": "[T]he causal link is contingent and indirect. The harm does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent criminal acts." Id.

The Court also refused to approve of the "dry-up-the-market" rationale in another non-child pornography case, Bartnicki v. Vopper, 121 S. Ct. 1753 (2001). The Court held that the First Amendment protected the media's publication of a cell phone conversation obtained by a third party in violation of a content-neutral law prohibiting wiretapping. Id. at 1765. Declining to draw an analogy to Ferber, the Court reasoned that preventing the disclosure of the illegally obtained conversation was not one of the "rare occasions in which a law suppressing one party's speech may be justified by an interest in deterring criminal conduct by another." Id. at 1762. The Court explained that "[i]n cases relying on such a rationale . . . the speech at issue is considered

-17-

of minimal value." Id. at 1762 n.13 (citing Osborne, 110 S. Ct. 1691; Ferber, 102 S. Ct. 3348).

2.   The "Dry-Up-the-Market" Rationale Does Not Apply

While the Supreme Court has never approved of this rationale outside the child pornography context, it has not foreclosed the possibility of doing so.   Nevertheless, as explained in both child pornography and non-child pornography cases, the Court has established a high threshold for the application of the "dry-up-the-market" rationale.   Section 48 does not meet that threshold.

(a)   Interest Balancing

As an initial matter the court will address the "balance of competing interests" at stake.   See Stevens, 130 S. Ct. at 1586. Although the constitutionality of § 48 cannot rest on evaluations of competing interests alone, see id. at 1586, the decisions in Ferber and Osborne specifically addressed both the interest to be protected and the value of the expression.   The interest in protecting animals from extreme pain and suffering are significant and weighty.   Such an interest does not, however, rise to the level of "surpassing importance." See Ferber, 102 S. Ct. at 3355.   Nor is it "compelling" "beyond the need for elaboration." See Osborne, 110 S. Ct. at 1696.   The court does not view the protection of animals from pain or death as a government objective equivalent to the protection of children from abuse.   As to the second interest addressed in Ferber and Osborne, the value of animal crush videos

-18-

generally, like the value of child pornography, is *de minimis*. Videos depicting live animals do not constitute a necessary part of any literary work or artistic performance. See Ferber, 102 S. Ct. at 3357. Moreover, "virtual" animal crush videos could serve the same expressive purpose, whatever that may be. See id. ("Simulation outside of the prohibition of the statute could provide another alternative."). Consequently, while the interest in protecting animals is not equivalent to the interest in protecting children, the extremely low value of animal crush videos is similar to that of child pornography.

      (b)   Relationship to an Underlying Crime

In Brown the Supreme Court described Stevens as suggesting that the prior version of § 48 "might pass muster if it were limited to videos of acts of animal cruelty that violated the law where the acts were performed." Brown, 131 S. Ct. at 2734 n.1. Section 48 lists multiple methods of harming or killing animals -- crushing, burning, drowning, suffocating, impaling, or otherwise subjecting to serious bodily injury -- that are banned from being depicted in videos, if those videos are also obscene. See § 48. But the language of the statute does not define a crime of animal cruelty. Moreover, the statute lacks any requirement that the acts be illegal where they are performed.[20]

------

[20]Moreover, unlike the market for child pornography at issue in Ferber, the market for animal crush videos is not "intrinsically
(continued...)

-19-

In contrast to Ferber, where the Court approved of New York's effort to control "the production of material which *requires the sexual exploitation of children*," see Ferber, 102 S. Ct. at 3356 (emphasis added), this case does not involve materials that *require* illegal conduct for their production. The conduct that amounted to the sexual exploitation of children was "illegal throughout the Nation," see Stevens, 130 S. Ct. at 1586; Ferber, 102 S. Ct. at 3357, but the acts depicted in animal crush videos as defined by § 48 do not necessarily amount to criminal activity under federal or state law. The court therefore rejects the United States' argument that Congress has demonstrated that the content of animal crush videos, as defined by § 48, is criminal.[21] The Supreme Court's discussions of the "dry-up-the-market" rationale have made clear that to be justified by that rationale laws must target explicitly illegal activity. Nothing in § 48 requires that the acts enumerated in subsection (a)(1) be illegal.

The court recognizes that Congress concluded that "[s]erious acts of extreme animal cruelty are integral to the creation, sale, distribution, advertising, marketing, and exchange of animal crush

---

[20](...continued)
related" to animal cruelty crimes because the videos are not "permanent records of abuse." See Osborne, 110 S. Ct. at 1697. Although the videos do create victims -- the animals themselves -- there is no ongoing harm inflicted on the victims by the continuing distribution of the videos. Animal crush videos therefore stand in contrast to child pornography materials, which perpetuate the original crimes by continuing to harm the children portrayed.

[21]United States' Response, Docket Entry No. 36, p. 31.

videos."[22]  Pub. L. 111-294, Stat. 3177, § 2(7).  This may be true,
and "[t]he most expeditious if not the only practical method" of
combating illegal animal cruelty "may be to dry up the market" for
videos that depict illegal animal cruelty.  See Ferber, 102 S. Ct.
at 3356.  But by its terms § 48 does not dry up that specific
market.  Instead, Congress has written a law to proscribe speech
that seems to straddle a line between obscenity and speech integral
to criminal conduct, but cannot be fairly categorized as either
one.  The court therefore concludes that the speech proscribed by
§ 48 is not excluded from First Amendment protection as speech
integral to criminal conduct.

## IV.  Application of Strict Scrutiny

As a content-based regulation of protected speech, § 48 is
invalid unless the United States can demonstrate that the statute
is justified by a compelling government interest and is narrowly
tailored to serve that interest.  Brown, 131 S. Ct. at 2738.  The
United States bears a heavy burden, for "[i]t is rare that a
regulation restricting speech because of its content will ever be
permissible."  Playboy, 120 S. Ct. 1889.  The court concludes that
the United States fails to meet this burden.

---

[22]Citing Turner Broadcasting System, Inc. v. F.C.C., 117 S. Ct.
1174, 1189 (1997), the United States argues that the court owes
substantial deference to the predictive judgments of Congress in
this respect.  United States Response, Docket Entry No. 36, p. 26.
Reliance on Turner is misplaced.  Turner involved the application
of intermediate scrutiny to a content-neutral regulation, while the
court deals here with a content-based prohibition.  See Brown, 131
S. Ct. at 2738-39.

The court is persuaded that the government's interest in preventing animal cruelty is compelling for purposes of strict scrutiny. This interest is grounded not only in society's interest in "protecting animals from suffering due to cruel acts," but also in preventing the "moral degradation" of society as a whole. H.R. REP. 111-549, p. 9. Moreover, § 48 reasonably can be said to promote that interest. But the First Amendment requires more: To be narrowly tailored a content-based regulation of speech must be *necessary* to promote the government's compelling interest. R.A.V., 112 S. Ct. at 2549. Narrow tailoring also requires the United States to prove that the content-based regulation is the "least restrictive available means" to further the federal government's compelling interest. Playboy, 120 S. Ct. at 1892.

Section 48 is not narrowly tailored for reasons expressed in the preceding section regarding the "dry-up-the-market" rationale. While the stated compelling interest is the prevention of illegal animal cruelty, the statute is not narrowly tailored to serve that interest.[23] Because § 48 is not limited to acts of illegal animal cruelty, the court concludes that § 48 is not narrowly tailored and

---

[23]The United States makes a passing reference to the need for a statute of this kind because the perpetrators in many animal crush videos remain anonymous, which frustrates the ability of law enforcement to investigate and prosecute the underlying crimes of animal cruelty. United States' Response, Docket Entry No. 36, p. 32. Congress also referred to the problem of anonymity in its Findings. Pub. L. 111-294, 124 Stat. 3177, § 2(9). Section 48, however, is not limited to depictions in which the perpetrators remain anonymous, adding further support to the court's conclusion that the statute is not narrowly tailored for purposes of strict scrutiny review.

therefore cannot survive strict scrutiny review.   Section 48 is therefore unconstitutional.

## V.  **Conclusion and Order**

The acts depicted in animal crush videos are disturbing and horrid.  But "[t]he history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly."  <u>Playboy</u>, 120 S. Ct. at 1893. The court concludes that the speech proscribed by § 48 does not fall within either categorical exclusion invoked by the United States.   Furthermore, the court concludes that § 48 cannot withstand strict scrutiny and therefore abridges the freedom of speech protected by the First Amendment.[24]

Accordingly, Brent Justice's Motion to Dismiss (Docket Entry No. 29) and Ashley Nicole Richards' Motion to Dismiss (Docket Entry No. 30) are **GRANTED,** and Counts One, Two, Three, Four, and Five are **DISMISSED.**

**SIGNED** at Houston, Texas, on this 17th day of April, 2013.

SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[24]The court has allowed the parties to fully brief the pending motions.  The court has carefully considered the parties' arguments and has reviewed the relevant authorities to be as fully informed as possible when addressing the parties' arguments.  While it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion.  Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.